UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EXCELL CONSUMER PRODUCTS LTD., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-07220-LAK |
| | ) | ECF Case |
| SMART CANDLE, LLC | ) | |
| and | ) | |
| STRUCTURAL INTEGRITY PROPERTY | ) | |
| SERVICES, LLC., | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF EXCELL CONSUMER PRODUCTS LTD.'S
PROPOSED FINDINGS OF LAW AND PROPOSED FINDINGS OF FACT**

Plaintiff Excell Consumer Products Ltd.'s ("Excell") hereby sets forth its proposed findings of law and proposed findings of fact as follows:

## I.    PROPOSED FINDINGS OF FACT

1.    Excell is an English company organized under the laws of the United Kingdom, with a principal place of business at A1 Fairacres, Industrial Estate, Dedworth Road, Windsor, Berkshire SL4 4LE.

2.    Defendant Smart Candle, LLC ("SCL") is a Minnesota limited liability company with its principal place of business at 1701 W. 94th Street, Suite 100, Bloomington, MN 55431.

3.    Defendant Structural Integrity Property Services, LLC ("Structural") was a Minnesota limited liability company.

4.    Structural merged with SCL and SCL is the surviving company.

5.    On or about July 11, 2002, Excell entered into an agreement titled "Licence Agreement" (the "2002 License") with Smartcandles.co.uk Limited ("SCK"), an English company.

6.    Paragraph 15 of the 2002 License provides, *inter alia*, that the agreement shall be governed in all respects by English law.

7.    The license included provisions by which patent and technology rights, copyrights and the mark SMARTCANDLES were to be licensed to Excell.

8.    Prior to the issuance of the 2002 license, SCK had not sold any products marked SMARTCANDLES.

9.    SCK had no list of existing customers to provide Excell with either. While small scale test marketing of some products had occurred, it appears that such was under the CANDELA brand name.

10.    Notwithstanding what the 2002 License stated, the Licensor, SCK did not own any tooling. However, Excell did not know, at the time that the 2002 License was executed in July 2002, that this was the case.

11.    The printed circuit board and software within the samples created by SCK were not of high quality and Excell created new software and a new board. The hardware and software is the primary functional component of the products.

12.    Excell also determined that the packaging originally proposed for the products was not commercially viable and, accordingly, redesigned the packaging. In connection therewith, Excell changed the trademark from SMARTCANDLES to SMART CANDLE and SMART CANDLES.

13.    Permission to make these changes was not sought but Excell did provide a copy thereof to SCK, when they were completed. SCK never granted or denied permission to sell products so altered or to change the packaging and trademarks.

14.    SCK had three directors and principal owners, Leigh Blackbourn, Leigh's father George

Blackbourn and Warwick Adams.

15.   Around the time the license to Excell issued, Leigh Blackbourn became insolvent and, on September 16, 2002, one of his creditors started bankruptcy proceedings against him and, on December 10, 2002, a bankruptcy order was issued by the High Court of Justice of England and Wales.

16.   Leigh Blackbourn had, in fact, filed two patent applications, naming himself as sole inventor, one in the UK and a corresponding application in the United States.

17.   Leigh Blackbourn did not transfer the applications to SCK.

18.   Leigh Blackbourn, as an undischarged bankrupt, was also legally prohibited from transferring any of the shares of stock he owned in SCK to anyone. Leigh Blackbourn, while legally required to inform the bankruptcy receiver that he owned shares in SCK, owned the domain name SMARTCANDLES.CO.UK and that he owned the patent applications, failed to do so.

19.   There was essentially no other contact between SCK and Excell, other than to royalty related matters and in response to an inquiry by Excell on July 22, 2004 (at which time it learned that an application to register SMART CANDLES had been filed and abandoned).

20.   SCK filed Application Serial No. 76/476,551 on SMARTCANDLES for "electronic and battery operated candles; electronic and battery operated interior lights; lamps; table lamps; standing lamps; glass lamps; lamp bases and stands; glass covers for lamps" on December 18, 2002. The application was abandoned on February 27, 2004.

21.   At no time ever did anyone from SCK inspect or even visit Excell's facilities for quality control purposes. At no time did anyone from SCK ever inspect or visit the company that Excell

had hired in China, Keiyo Electronic Limited, to manufacture the goods sold by Excell in connection with the trademarks. At no time did anyone from SCK ask to examine or inspect products actually being sold by Excell.

22. No term or provision of the 2002 License states that the Licensor shall have the right to control the nature and quality of the goods or equivalent words. The 2002 License, moreover, includes no terms or provisions by which the Licensor, SCK, even had the right to inspect Excell's facilities or the facilities of the company which Excell employed to manufacture the products identified in the 2002 License. In fact, no term or provision in the 2002 License granted the Licensor the right to preclude Excell from selling any product due to its quality, even if Licensor disapproved of it for quality reasons. No provision of the 2002 License sets forth any requirement that the Licensee manufacture products consistent with the samples submitted or that the Licensee obtain approval from Licensor before selling products, approved or otherwise.

23. No provision of the 2002 License expressly precludes Excell from challenging the trademark rights of SCK, either during or after the expiration of the 2002 License.

24. The 2002 License also contained no terms or provisions calling for payment of any royalty for the use of the trademark identified in the document, SMARTCANDLES.

25. Payment terms under the 2002 License related solely to use of technology, which is principally what is described in the specified patent applications filed by Leigh Blackbourn.

26. The trademark identified in the 2002 License was not centrally important to the 2002 License.

27. The 2002 License, as per Section 3 thereof, placed quality control obligations solely on the Licensee, Excell. Specifically, the Licensee – Excell – was required to control the production

of the goods involved, including even goods sold by the company hired by Excell to manufacture the products.

28. The US patent application filed by Leigh Blackbourn was abandoned on February 10, 2004.

29. It, in any event, does not appear that Mr. Blackbourn had invented anything. Mr. Blackbourn's UK patent application does not appear to disclose any patentable inventions.

30. However, Excell did not know any of this until after entering into a further agreement with SCK in 2004.[1]

31. Little, if anything, provided to Excell under the 2002 License had ever been owned by the Licensor, SCK.

32. There is not even any evidence that SCK has ever sold any products under the SMARTCANDLES, SMART CANDLES or SMART CANDLE mark, either prior to the issuance of the 2002 License or thereafter.

33. Excell took on full financial responsibility for the promotion and development of the products upon entering into the 2002 License. This included, for example, advertising the same; and applying for and obtaining the domain name www.smartcandle.co.uk, as well as using the SMART CANDLE and SMART CANDLES marks.

34. Neither SCK nor the owners of SCK made any financial or other contribution to such promotion or development by Excell at any time after July 11, 2002.

35. Excell – not SCK – carried on business under the SMART CANDLES or SMART CANDLE mark after July 11, 2002.

---

1 This agreement, entered into in 2004, will be referred to as the "2004 Agreement" and is the subject of numerous proposed facts hereinafter.

36.     The first distributor of Excell's SMART CANDLE products in the USA was Dorcy International Limited ("Dorcy") of Columbus, Ohio to whom Excell commenced sales of SMART CANDLE products in 2002.

37.     Excell also commenced sales of SMART CANDLE products in 2003 to a company called Rasmussen Import Company ("Rasmussen") of Chaska Minnesota and, on May 1, 2004, to a company called Department 56 Inc. ("Department 56") of Eden Prairie, Minnesota, with whom Excell entered into a formal Memorandum of Understanding concerning distribution of SMART CANDLE products in North America and to whom Excell commenced sales in the same month.

38.     Separately, during 2004 Excell entered into discussions with Bridgehouse, a buying agency based in London, UK concerning the possibility of supplying SMART CANDLE products to Plow & Hearth of Madison, Virginia for distribution in the USA and these resulted in Plow & Hearth also becoming a US reseller of Excell's SMART CANDLE products, with Excell's sales to Plow & Hearth commencing in late 2004.

39.     Excell carried on business in the manufacture, sale, and supply of electronic candle products under and by reference to SMART CANDLE and SMART CANDLES.  Until December 17, 2004, Excell did so pursuant to the terms of the 2002 Agreement.

40.     Excell provided to SCK schedules of Excell's sales of candles in the full period of the 2002 License up to at least March 31, 2004 for the purposes of calculation of the royalties due under Clause 6.1 of the 2002 License.

41.     Entirely new tooling for manufacturing the goods was created by Excell. Sales, using that tooling, began in November of 2004. Use of the old tooling ceased at that time. It was then scrapped.

42.     The new tooling produced essentially the same products of the same quality as those previously sold.

43.     During 2004, Excell began to develop greater business prospects for the SMART CANDLE products in the United States.

44.     In September of 2004, Tim Cowley of Excell spoke with Warwick Adams of SCK about buying SCK's assets.

45.     Warwick Adams was told that Excell had prospects to develop its business but that the 2002 License had outlived its usefulness.

46.     Warwick Adams informed Tim Cowley that SCK was looking to wind up its business because the company was insolvent.

47.     Warwick Adams stated that the debt the company needed to recover in order to wind up the business was (GBP) £85,000.00.  SCK's total debt was (GBP) £142,500.00.

48.     As of October 11, 2004 the outstanding net amount of royalties owed to SCK by Excell under the terms of the 2002 License was £586.42 inclusive of the Value Added Tax chargeable.

49.     The commercial objective which SCK and its owners and directors sought to achieve in the 2004 Agreement was payment of money so that it could wind up the business, and Excell knew this and the commercial objective which Excell sought to achieve in the 2004 Agreement was outright ownership of the business which had been licensed to it under the 2002 License, and SCK and its owners and directors knew this.

50.     Excell and SCK entered into the 2004 Agreement no later than December 17, 2004, by virtue of which Excell acquired the business assets, including, if they were not already owned by Excell, the SMART CANDLE, SMART CANDLES and SMARTCANDLES marks and the

good will associated therewith.

51.     The contents of the 2004 Agreement were based on the common belief of Excell and SCK that it was only necessary to specifically identify the publicly recorded assets believed to be in existence and that these recorded assets were the intellectual property rights.

52.     The 2004 Agreement contains no merger clause or even the equivalent thereof.

53.     Excell and SCK believed that the assignment of the domain www.smartcandles.co.uk to Excell signified that Excell had acquired all of the exclusive rights connected with the use of the trademarks SMARTCANDLES, SMART CANDLES and SMART CANDLE.

54.     Together with the 2004 Agreement, SCK sent Excell a copy of a letter Leigh Blackbourn wrote to Nominet, the UK domain registry, by which Mr Blackbourn attempted to comply with Clause 2 of the 2004 Agreement in light of the fact that important documentation had been lost in the course of the closure of SCK's office. In that letter, Mr Blackbourn wrote "we are in the process of selling the intellectual property and other intangible assets of Smartcandles.co.uk Limited … to Excell," which show that SCK understood that the assignment of the domain www.smartcandles.co.uk to Excell signified that SCK was assigning all of the intellectual property rights associated with the Smartcandles business.

55.     Among the provisions of the 2004 Agreement is the first numbered paragraph which provides, *inter alia*, that the 2004 Agreement replaces the 2002 License.

56.     Following entering into the 2004 Agreement, Excell continued to carry on its existing business in the manufacture, sale, and supply of electronic candle products under and by reference to its marks.

57.     Excell conducted itself as if it owned the SMART CANDLES and SMART CANDLE

marks outright, and not merely as a licensee.

58.    For instance Excell did not seek or obtain any permission, whether from SCK or its directors or owners or anyone else in relation to Excell's use of the said marks.

59.    At no time before or after the 2004 Agreement did SCK compete with Excell.

60.    Following entering into the 2004 Agreement, neither SCK nor its owners or directors purported to control or restrict Excell's use of the SMART CANDLES or SMART CANDLE mark in any way.

61.    SCK, in a separate document, assigned the UK patent application to Excell.  The US patent application had already been abandoned.

62.    Prior to executing the 2004 Agreement, Excell was unaware that there was no patent application pending in the United States.

63.    Excel learned that this was the case soon after entering into the 2004 Agreement.

64.    Excell also soon learned that the UK patent application was worthless, as it had been rejected and was about to become abandoned.

65.    At the time that the 2004 Agreement had been executed, Excell already knew that the US trademark application had been abandoned.

66.    Leigh Blackbourn, while legally required to inform the bankruptcy receiver of his ownership of shares in SCK, in the domain name SMARTCANDLES.CO.UK and in the patent applications (and to surrender such assets to the control of the bankruptcy receiver), failed to do so.

67.    The 2004 Agreement, by its words, presumes that Excell would continue to conduct its SMART CANDLE business, which had been conducted by Excell under both the mark SMART

CANDLE and SMART CANDLES.

68.     Nothing in the 2004 Agreement required Excell to change its trademark.  No license of any rights is mentioned in the document.  Both sides of the 2004 Agreement knew that Excell was using SMART CANDLE and SMART CANDLES and intended to continue doing so.

69.     Shortly after entering into the 2004 Agreement, a cease and desist letter was received by Excell in which patent infringement was alleged by a U.S. company.  Such letter was sent to Structural, which passed it on to Excell.

70.     In addition, it was learned that the US patent application had been abandoned and that the UK patent application had been rejected, inter alia, for lack of novelty (i.e., no invention).

71.     Excell made an initial payment of (GBP) £1800 in connection with the 2004 Agreement.

72.     Realizing that the patent applications purchased had been abandoned or rejected, Excell stopped paying.

73.     The financial aspects of the 2004 Agreement were renegotiated following an approach to Excell by Leigh Blackbourn in July 2006 in which Leigh Blackbourn claimed that he and his father were embarrassed by a bank debt of £20,000.

74.     Excell sought to have a written agreement confirming a full and final settlement figure for the 2004 Agreement of £20,000 instead of £85,000 and sought to close down any relationship between Excell and SCK.

75.     Leigh Blackbourn sent to Excell at least two drafts of the agreement finally reached ("the 2006 Agreement").

76.     In the 2006 Agreement, SCK confirmed the following:

> To summarize this agreement the payment of £20,000 is good faith, and in full an
> (sic.) final settlement of any outstanding claims for ownership, tooling,

commissions , Brand name, copyright, Website,etc, (sic) appertaining to the UK business of Smart Candles.co.uk.

It is further agreed that by signing this agreement Smart Candles .co.uk limited (sic.), will not interfere, or try to associate themselves as partners or owners of the Smart Candle product range as marketed by Excell consumer Products Limited (sic.) this also extends to contacting any of the customers that are the distributor set up and maintained by Excell Consumer Products Limited.

77.    Leigh Blackbourn forged his father, George Blackbourn's, signature on the 2006 Agreement.  Leigh Blackbourn, however, had authority to act on behalf of SCK.

78.    Leigh Blackbourn and George Blackbourn were known by Excell to be officers and owners of SCK.

79.    Paragraph 4 on page 7 of Exhibit 55, which is the Certificate of Incorporation for SCK, states, in pertinent part, that "A sole director shall have authority to exercise all the powers and discretions by Table A and these Articles expressed to be vested in the Directors generally, and Regulation 89 is modified accordingly."

80.    Exhibit 56 is Table A, which is a schedule to the (UK) Companies Act that sets out the regulations Regulations for Management of a Company Limited by Shares.

81.    Continuously between 2002 and the end of 2004, Excell made public the fact that Excell's SMART CANDLE products were manufactured and distributed under license.  In particular, Excell included leaflets with its products on which it is stated: "Smart Candle is manufactured and distributed under licence worldwide by Excell Consumer Products Limited UK" ("license notification") and were included in the packs of Excell's SMART CANDLE products supplied to Rasmussen and to Dorcy.

82.    A person who opened the relevant packs of Excell's SMART CANDLE products that were available in the USA in 2004 could not have failed to have seen one of the aforesaid leaflets

bearing the aforesaid license notification.

83. In 2005, the content of the aforesaid leaflets included in the packs of Excell's SMART CANDLE products was updated and the license notification was not included in newly-printed leaflets from that time on.

84. The two principals of Structural, Joshua Kutzler and Shane Vail were also employees of Rasmussen, until they left their employment at Rasmussen.

85. Joshua Kutzler did not leave his employment with Rasmussen until January of 2005.

86. Shane Vail left his employment with Rasmussen in October of 2004.

87. On or about October 1, 2004, Joshua Kutzler and Shane Vail visited Excell with a business proposition.

88. By the time of Excell's first meeting with Messrs. Kutzler and Vail of Structural Integrity Property Services LLC ("Structural") the agreement eventually entered into with SCK had already been reached in principle and price.

89. Structural was desirous of distributing the SMART CANDLE product then being sold by Excell to, among other US companies, Rasmussen.

90. Prior to Mr Kutzler's first contact with Mr. Cowley, Karl Rasmussen, President of Rasmussen informed Mr. Cowley that Crate & Barrel and Walgreen's were among Rasmussen's long-standing customers.

91. Mr Kutzler and Mr Vail were, in the Summer of 2004, developing plans to build a website by which they would make money, without informing Rasmussen, from Rasmussen's relationship with Excell. This, notwithstanding the fact that Joshua Kutzler held himself out to be "Vice President for Operations and Finance" of Rasmussen. Mr. Kutzler used his

Rasmussen's email account of Rasmussen to advance the new Structural business. He was dissatisfied with the direction in which the owners of Rasmussen desired to take the company and, as such, ceased showing loyalty to the company for which he held himself out to be an officer.

92. Excell provided Structural with its conditions for using the SMART CANDLE name. In particular, the understanding was that SMART CANDLE would be used only to sell products approved by Excell. This was the understanding which governed the relationship between the parties throughout the time the two companies did business with each other.

93. Excell required changes to the wording used on the website by Structural. In particular, Excell required that the wording "US Distribution of smartcandles is handled through Smart Candle, LLC of Bloomington, MN via the site and contact information within" be changed on Structural's website. Structural made such changes.

94. The aforementioned requirement to change the wording on the website was concerned with the fact that Excell had other distributors of SMART CANDLE products in the USA such as Dorcy and Department 56.

95. REDACTED

96. REDACTED

97. At all times, Excell controlled the nature and quality of all goods it sold. This included an extensive quality assurance program. It also included determining what products would be sold and resolving customer issues in the event of any important instances related to the quality of the goods. Excell also determined what other products could by marketed by Structural on its website and Structural would seek approval from Excell to market such products.

98.     At the meeting that occurred between Excell and Structural on or about October, 1, 2004, Messrs. Kutzler and Vail presented their idea for their company, Defendant Structural, to resell Excell's SMART CANDLE products in the USA independently of Rasmussen. An understanding was reached whereby Defendant Structural would become another distributor of Excell's SMART CANDLE products in the USA.  There was no agreement that Structural would be the exclusive distributor of SMART CANDLE products.

99.     The first delivery of products from Excell for Structural to sell in connection with the SMART CANDLE trademark was dispatched from Excell in Windsor, England to the air-freight shipping company on December 15, 2004. Given the normal time taken for the shipping agent to handle such consignments and especially bearing in mind the UK national holidays around Christmas, that shipment will not have reached Structural until some time in January 2005. The second such delivery was dispatched by sea from Hong Kong on December 24, 2004, so also could not have arrived with Structural until some time in January 2005.

100.    All of the aforementioned products were manufactured for sale by Excell's manufacturer, Keiyo and none carried the SMART CANDLE & Design "Speech Bubble" logo designed for Structural on the product or packaging as supplied as supplies from Excell to Structural of products and packaging so marked did not commence until 2005.

101.    Structural was informed that Dorcy had stocks of Excell's SMART CANDLE products that had been purchased by them from Excell for resale and Excell suggested to Structural that it might approach Dorcy with a view to purchasing some of that stock. Structural later informed Excell on or about February 24, 2005 that Structural had bought out all of Dorcy's stock of Excell's SMART CANDLE products.  Excell never supplied to Dorcy any products or packaging

marked with the "Speech Bubble" logo.

102. Excell had decided to adopt the "Speech Bubble" logo and the packaging designs proposed by Structural for supplies of Excell's SMART CANDLE products to Structural because Structural had indicated that it felt that this would sell well in the USA.

103. However Excell had only recently updated designs for the packaging of its SMART CANDLE products featuring a new SMART CANDLE logo design created by Excell ("the white packaging") and until around 2007 some versions of Excell's SMART CANDLE products were continuously supplied to Structural and others in the US in the white packaging as well as in packaging to the design previously created by Excell in 2002 ("the blue packaging").

104. As early as October 17, 2004, Structural began to suggest to Excell that, in order to reduce Structural's costs, other distributors of Excell's SMART CANDLE products might adopt the packaging marked with the "Speech Bubble" logo.

105. In order to rationalize the growing variety of forms of its packaging and to provide better economies of scale, Excell later decided that it would also adopt the orange/blue packaging marked with the "Speech Bubble" logo for products supplied to other distributors of Excell's SMART CANDLE products. In or about September 2006 Structural issued an invoice to Excell for the cost of the design and layout of the orange/blue packaging and Excell paid Structural at least $8500 for this by way of factory credit.

106. Structural believed that Excell owned the SMART CANDLE mark but, without first obtaining permission from Excell, filed a trademark application to register SMART CANDLE in "stylized and/or with design" format in February, 2005.

107. Soon after filing the noted trademark application, Structural sent Excell a proposal to

create a formal distributorship agreement.

108.   Article II of the aforementioned proposed distributorship agreement provides, *inter alia*, for Structural's appointment as Excell's exclusive and sole agent of the applicable products in and for all of North America and Central America.

109.   Article 5.2.3 of the aforementioned distributorship provides, *inter alia*, that any use of advertising materials and/or mediums referenced in Article 5.2 are subject to approval by Excell, that Excell, in its sole discretion, may reject any or all of the advertising methods and/or associated literature and that Excell's trademarks and trade names can be used in such materials and through such methods as shall be authorized by Excell.

110.   Further distributorship agreement proposals were made by Structural.   Each such proposal identified Excell as the owner of the SMART CANDLE trademark and provided that upon the termination of such such agreement, Structural would cease using the noted trademark.

111.   None of the proposed exclusive distributorship agreements was executed.

112.   From time to time Excell received notice of customer complaints in connection with Excell's SMART CANDLE products. Customers from around the world, including customers based in the USA, contacted Excell directly in the UK with complaints or enquiries about SMART CANDLE products and Excell responded to these according to the relevant matters to be addressed.

113.   Structural and other companies that distributed SMART CANDLE products in the USA also communicated customer complaints and technical quality issues to Excell and looked to Excell to address the matters raised. Excell directed the response to such matters, including negotiating commercial compensations and directing Keiyo (and subsequently Faith Global, the

manufacturer with which Excell contracted following the insolvency of Keiyo in 2006) in any technical testing and development response that was necessary.

114.   Faith Global was also pro-active in notifying Excell of quality concerns identified within the factory and where necessary Excell communicated with distributors to warn them of the issue and direct the actions proposed to resolve it.

115.   All commercial arrangements relating to Excell's SMART CANDLE products between Excell and its distributors and other customers (including Structural) were directed by Excell. This included pricing, order handling, invoicing and marketing and promotional costs.

116.   Excell normally issued initial product samples directly to a new distributor customer, normally received initial orders directly from the distributor customer and issued initial invoices directly to the distributor customer. This was the case with Excell's distributors in the USA, including Structural.

117.   Regular purchasers of large quantities of Excell's SMART CANDLE products were permitted to have direct contact with the factory.  As was the arrangement with Excell's other distributors, Structural's ongoing orders for Excell's SMART CANDLE products were normally placed directly with Keiyo between 2004 and 2006 and with Faith Global from 2006 until Structural's last order in 2010.

118.   Excell directed that a copy of every purchase order for Excell's SMART CANDLE products placed with Keiyo or with Faith Global should be sent to Excell. Excell checked every such order and both Keiyo and Faith Global were instructed not to fulfill any such order without Excell's prior specific approval.

119.   Similarly, Keiyo and Faith Global were instructed to send Excell a copy of each invoice

for the supply of Excell's SMART CANDLE products and Excell checked each invoice to ensure that the pricing and any discounts or rebates were in accordance with what had been negotiated with the customer by Excell and both Keiyo and Faith Global were instructed to secure Excell's approval prior to such invoices being issued to the customer.

120. Excell has continuously directed the design and content of support materials for Excell's SMART CANDLE products, such as instruction leaflets included in the packs for the products.

121. Continuously since at least 2002 Excell has promoted Excell's SMART CANDLE products under the SMART CANDLE trademark in the USA.

122. In 2007, Excell employed a person called Emily Housego specifically to support, promote and extend Excell's SMART CANDLE business in the USA. Ms Housego arranged a number of visits to existing and potential reseller customers in order to promote sales of Excell's SMART CANDLE products.

123. Between 2004 and 2011, Structural represented itself as a distributor of Excell's SMART CANDLE products. An example of this is the press article downloaded from Defendant's website entitled "Wickless and waxless, candles light up sales charts" which includes the following statement "Developed by Excel Consumer Products Ltd., a British firm that licensed Kutzler and Vail as its distributors late in 2004, the Smart Candle employs a built-in microchip to replicate the natural flickering of candlelight."

124. From 2004 to the present Defendantshave continuously represented themselves as part of the global business developed by Excell in relation to Excell's SMART CANDLE business and have claimed in this connection the benefit of association of Defendants' U.S. business with Excell's global SMART CANDLE brand.

125.     Structural and, now, SCL sell SMART CANDLE products in the United States and in the State of New York.

126.     Excell never granted Structural the right to file any trademark application in the name of Structural and did not know about the US application filed in 2005 until years later.

127.     Structural was represented by legal counsel at least as early as February 10, 2005.

128.     Information about the US trademark registrations came to light in 2009 after the applications from which such registrations issued had been filed.

129.     Tim Cowley demanded the return of Excell's trademark.

130.     In March of 2011, Structural told Excell that Structural would no longer do business with Excell.

131.     Structural had found a new supplier, Shenzhen Liown Electronics Co., Ltd.

132.     Thereafter, Structural's successor, Smart Candle, LLC, commenced doing business on its own and without Excell's authority in connection with the SMART CANDLE trademark.

133.     Structural knew from the beginning that it was one of several companies selling products produced by another company and marked SMART CANDLE.

134.     In 2009, Excell learned that US Trademark Applications had been filed by Structural in Structural's own name and without Excell's consent.  Those applications are Application No. 76/630,886 (now Registration No. 3,155,669), filed on February 10, 2005, ("the 2005 Application") and Application No. 77/770,847 (now Registration No.3,762,634), filed on June 30, 2009 ("the 2009 Application").

135.     Excell never supported Structural with respect to the registration of any SMART CANDLE mark in the United States.

136. Moreover, Structural believed at the time that Excell owned the trademark SMART CANDLE.

137. In connection with the 2005 Application on or about February 03, 2005 Joshua Kutzler 's declaration, made under 18 U.S.C. 1001, states that "he believes the applicant corporation to be the owner of the trademark sought to be registered", "to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive", and "that all statements made of his own knowledge are true".

138. Mr Kutzler did not believe any of the aforesaid statements he made in the 2005 Application to have been true. Structural knew that it was one of several companies selling products produced by another company and marked SMART CANDLE and believed that Excell owned the trademark SMART CANDLE.

139. In a responsive document submitted to the Patent and Trademark Office in connection with the 2005 Application by Structural's attorney, Peter G. Nikolai, dated September 15, 2005, Mr. Nikolai states the following: "The examining attorney also attached website evidence that used the mark "SMART CANDLES" as well. Here, applicant points out that it is the North American distributor of SMART CANDLES. The attachments all show the applicant's products being resold by its customers. Therefore these attachments only show the strength of applicant's mark." Structural could not possibly have believed the aforesaid statement of Mr Nikolai to have been true because they knew, in 2005, that they were not selling the products to most, if not all, of the sources shown in the website evidence uncovered by the examining attorney in the

Patent and Trademark Office and certainly not to a source which marketed the product in British pounds. In fact, Structural had no customers in the UK.

140. In 2012, Structural filed a Declaration under Trademark Act Sections 8 and 15 in the Patent and Trademark Office with respect to the first registration, No. 3,155,669. The declaration avers "there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts."

141. Structural knew that it had been sued by Excell and, notwithstanding this knowledge, filed the aforesaid Declaration to the contrary because Structural had new packaging that it did not want to be copied.

142. In connection with the 2009 Application on or about October 29, 2009, Shane Vail's declaration, under 18 U.S.C. 1001 states that "he/she believes the applicant to be the owner of the trademark/service mark sought to be registered", "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive", and "that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."

143. Structural did not believe that any of the aforesaid statements made in the 2009 Application were true.

144. By October 29, 2009, when the aforementioned statements were made, Structural had been trying for more than four years to secure on behalf of Structural an exclusive distributor agreement with Excell, having submitted successive drafts of agreements all of which

acknowledged Excell as the owner of the SMART CANDLE trademark and had failed to secure Excell's agreement. Structural had also written to Excell on a number of occasions to express concerns about the fact that Excell was continuing to supply Excell's SMART CANDLE products to other parties in the USA.

145.    On May 20, 2011 Excell's attorneys Davis & Bujold LLC sent a letter to Structural notifying Structural that it was no longer an Excell distributor and requesting that Structural immediately ceased and desisted from all use of SMART CANDLE, www.smartcandle.com and any trademark similar thereto, and voluntarily surrendered, abandoned or canceled any and all registrations or applications for registration of any such marks that it had filed and that all Structural's rights in and to the domain name www.smartcandle.com be assigned to Excell.   . Excell has never received any substantive response to that letter from or on behalf of Structural.

146.    As a result of Defendants' activities, Excell no longer has any control over the quality of the products being sold by the Defendant Smart Candle, LLC in connection with the SMART CANDLE mark and no longer has any control over the use of the SMART CANDLE name and the SMARTCANDLE.COM domain name by the Defendants.

147.    Excell and Defendants are now continuing to use the SMART CANDLE trademark and Defendants are now also continuing to use the name SMART CANDLE and the domain name SMARTCANDLE.COM.

148.    Any income taken in by either of the Defendants since the time that business with Excell was terminated relates to the aforementioned use of SMART CANDLE and the domain name SMARTCANDLE.COM and whatever profits were so earned relate to that use.

149.    SCL received revenue from the sales of SMART CANDLE products, from the time it

ceased doing business with Excell, in the amount of [**REDACTED**], as of June, 2012.

150.    Any revenue received by SCL from sales of SMART CANDLE products would, but for the failure of SCL to purchase its goods from Excell, have resulted in revenue to Excell.

151.    SCL's revenue is the result of knowingly reaping the harvest of Excell's trademark SMART CANDLE.

152.    Excell lost all of the sales revenue that it would have had were SCL to have purchased SMART CANDLE products from Excell's authorized source.

153.    As a result, Excell's US business has lost nearly all of its US business.

154.    Neither of the Defendants demanded that Excell cease using SMART CANDLE.

155.    Neither of the Defendants demanded that Excell cease doing business with any of the third parties with who Excell sold SMART CANDLE brand products.


## II.    PROPOSED FINDINGS OF LAW

1.    After a valid assignment, the assignee acquires all of the legal advantages of the mark that the assignor enjoyed, including priority of use.

2.    Where a company's assets are distributed to a party which continues the same business with the same inventory and produces the same products as the original company, the goodwill, which would include the trademark, is transferred.

3.    When a business is sold as a going concern, trademarks and the good will of the business that they symbolize are presumed to pass with the sale of the business.

4.    Even if the word "trademark" or similar terms are not mentioned in the contract of sale of the business, the trademarks of the business are presumed to pass to the buyer as an important

part of the business and its good will. The sale of the good will is sufficient to assign the trademark.

5. Where fewer than the total assets of a business are purchased, the test for determining whether a trademark is assigned is whether the assets bought are sufficient to enable the buyer to go on in real continuity with the past.

6. Where products are made according to a secret formula or a patent, these may constitute "good will" which must be transferred to the assignee of the mark..

7. The asset that a reasonable person would believe was critical to continuing the business in continuity with the past was the US patent application, which was assigned to Excell.

8. Excell continued in the same business with the same inventory and produced essentially the same products and quality of products that were being sold prior thereto while SCK ceased its business in connection with the mark, such that SCK assigned the SMART CANDLE, SMART CANDLES and SMARTCANDLES marks to Excell.

9. The 2004 Agreement provided for sale of the only assets imaginably necessary to continue the business in real continuity with the past, namely, the patent applications and the domain name. Under such circumstances, the good will, which would include the trademark, was transferred.

10. On February 6, 2007, SCK ceased to exist as a company and any assets it may still have owned (e.g. money paid by Excell) became the property of the (UK) Crown, §654 of the [UK] Companies Act (1985), or ceased to exist at that time. *See*, *Companies BVC 12 - Sale of Trade Marks*.

11. While sufficient assets were, in fact, passed to Excell to assign the good will and SMART

CANDLE, SMART CANDLES and SMARTCANDLES trademarks, the 2004 Agreement is, if properly construed under English contract law, itself an assignment of the SMART CANDLE, SMART CANDLES and SMARTCANDLES trademarks and associated good will.

12.     Under English contract law, the proper interpretation of a contract is determined by finding what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101.

13.     As stated in Chartbrook at [14]:

> 14     There is no dispute that the principles on which a contract (or any other instrument or utterance) should be interpreted are those summarised by the House of Lords in Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896, 912-913. They are well known and need not be repeated. It is agreed that the question is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. The House emphasised that "we do not easily accept that people have made linguistic mistakes, particularly in formal documents" (similar statements will be found in Bank of Credit and Commerce International SA v Ali [2002] 1 AC 251, 269; Kirin-Amgen Inc v Hoechst Marion Roussel Ltd [2005] 1 All ER 667, 681-682 and Jumbo King Ltd v Faithful Properties Ltd (1999) 2 HKCFAR 279, 296) but said that in some cases the context and background drove a court to the conclusion that "something must have gone wrong with the language".  In such a case, the law did not require a court to attribute to the parties an intention which a reasonable person would not have understood them to have had."

14.     English contract law is highly contextual, meaning that a substantial factual matrix of background information is **<u>always</u>** relevant, even if the agreement in issue is an integrated contract.  "The background was famously referred to by Lord Wilberforce as the 'matrix of fact', but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been available to the parties and to the exception

to be mentioned next, it includes anything which would have affected the way in which the language of the document would have been understood by a reasonable man." *Investors Compensation Scheme Ltd. v. West Bromwich Building Society* [1998] 1 WLR 896.

15.    In fact, the relevant evidence may be such as to show that the seemingly clear textual meaning of an agreement is not, under English law, the proper interpretation of that agreement. "'[I]f detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense.'" *Investors Compensation Scheme; cf.*, *R Griggs Group Ltd & Ors v Evans & Ors* [2005] EWCA Civ 11 (25 January 2005)[2] (in which the following letter agreement was found to be an assignment, based on the needs of the parties but not supported by specific wording of the letter agreement:  "Dear Ross, In response to our recent discussions, I am pleased to confirm that we would be happy to commission creative work from you. As agreed, this would be paid for at a standard rate of £15 per hour. I am sure we both realise that some work may need to be charged at less than this rate, whilst other operations can equally charged at somewhat more.").

16.    Contrary to the opinion expressed by Defendants' expert, English law would not likely look "foremost" at an agreement, such as the 2002 License, that was superseded by an agreement such as the 2004 Agreement.  *See,* discussion in *Giedo Van Der Garde BV & Anor v Force India Formula One Team Ltd* [2010] EWHC 2373 (QB) (24 September 2010).  As stated in paragraph 161 of *Giedo Van Der Garde BV & Anor*:

   The position thus appears to be that there is no authority binding on me either for
   or against the proposition that a prior written agreement is admissible for the
   purpose of construing a subsequent written agreement. I would however observe
   that Rix LJ was at pains to emphasise that even if a prior written agreement is, as

---

2    *R Griggs Group Ltd & Ors v Evans & Ors* was decided by Defendants' expert on English law,
     Sir Robin Jacob.

he held to be the case, admissible for the purpose of construing a later one its usefulness as an aid to construction is likely to be limited in most cases. Where the language in the two documents is identical, the former is unlikely to add anything to the exercise of construing the latter. If the wording in the later contract is different the prima facie influence is that the difference is a deliberate decision to depart from the earlier wording which thus provides no assistance. Hence his emphasis for the need for a cautious and sceptical approach to finding any assistance in the earlier contract.

17.     There are no statutory restrictions in English law relating to assignments of unregistered trade marks.  Thus, for instance, there is no requirement that such assignment be in writing. What is clear is that one cannot assign such marks without the goodwill of the relevant business. Conversely, the sale and transfer of the goodwill of a business assigns unregistered trade marks used in the business to the purchaser by implication.

18.     Under English law, "goodwill must remain in the same ownership as the business to which it relates."  Wadlow, *The Law of Passing Off*, 4th edition, Chapter 3, Section J, at 3-192.

19.     Moreover, under English law (Wadlow, at 3-192),

An assignment of goodwill does not have to be in writing or any particular form, and need not mention goodwill by name.  A transaction intended to assign a business as a whole necessarily passes the goodwill to the assignee.  A transaction which purports to deal with specific brands or marks may be interpreted as dealing with the goodwill of the business in which they are used.  It should be remembered that in construing commercial documents the golden rule is to give effect to the common intention of the parties as expressed in the words they have chosen to use, and to that extent words such as 'goodwill' may be used in a variety of ways at variance with their strict legal meaning.

20.     By way of contrast dealings in registered marks under English law are governed by statute.  Assignments of registered trade marks are not effective unless made in writing signed by or on behalf of the assignor or the assignor's personal representative: see s 24(3) of the Trade Marks Act 1994.  Although such assignments can be made without the goodwill of a business (see s 24(1) of the Act and *Scandecor Development AB v Scandecor Marketing AB* [2002] FSR

7) this right only arises because s 24(1) of the Act says so. Moreover although this section permits a registered trade mark to be assigned without such goodwill, actually doing so may render the mark in question liable to revocation under s 46 of the Act, as discussed in Kerly at 13-046 to 13-059. These complications are part of the reason why, as recognised in Kerly at 13-039, "the vast majority of trade mark assignments include the transfer of goodwill". Thus even in the case of registered trade marks, assignments of the marks which exclude goodwill of the relevant business are unusual.

21.    Notwithstanding what Sir Robin Jacob asserts in his expert report, as a Judge he found that a business was purchased without purchasing the debts or even all of the assets. *I N Newman Limited v Richard T Adlem*, 2005 WL 1410042 (Court of Appeal, 2005).

22.    Applying English contract law, "the context and background [to the 2004 Agreement leads] to the conclusion that 'something must have gone wrong with the language'." *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101. Any other interpretation would require a Court to attribute to the parties an intention which a reasonable person would not have understood them to have had.

23.    Alternatively, and insofar as necessary, English law would imply a term to the effect that Excell acquired all of the intellectual property rights owned by the SCK in relation to the SMART CANDLE business.

24.    If Defendants' expert, Robin Jacob, is correct that, after and by virtue of the 2004 Agreement, Excell was informally permitted to use the marks, then the such informal permission is properly construed under US law as assigning Excell rights in the SMART CANDLE, SMART CANDLES and SMARTCANDLES trademarks in that such consent benefitted SCK, most

particularly in that SCK (or at least what appeared to Excell to be SCK) received at least (GBP) £20,000, for essentially nothing other than the trademarks and associated goodwill, from which Excell developed the business under the SMART CANDLE mark; there is no credible evidence that SCK was paid a licensing fee for the use of SMART CANDLE or any other mark after entering into the 2004 Agreement; not only is there no credible evidence that SCK intended to retain the ability to revoke Excell's right to use the SMART CANDLE mark but also there is no evidence that SCK believed that SCK could do so; and, the evidence, such as the 2006 Agreement, shows that SCK understood its consent to be an irrevocable assignment to the Excell. *Martha Graham School v. Martha Graham Center*, 153 F. Supp. 2d 512, 525 - 526 (SDNY 2001).

25.     Leigh Blackbourn had authority, pursuant to SCK's Articles of Association, to bind SCK.

26.     Alternatively, with respect to the 2006 Agreement, Leigh Blackbourn had at least apparent authority under English law to bind SCK. *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2B 480. In particular, (1) Leigh Blackbourn and George Blackbourn were both known by Excell to be officers and owners of SCK and Leigh Blackbourn represented that he was acting on behalf of SCK in that he sent drafts of the 2006 Agreement to Excell and, as such, he was an agent who had authority to enter on behalf of SCK into a contract of the kind herein involved; (2) as a director and stockowner of SCK, such representation by Leigh Blackbourn, and/or the apparent signature by George Blackbourn, was made by a person or persons who had "actual" authority to manage the business of the company either generally or in respect of those matters to which the contract relates; (3) Excell entered into the 2006 Agreement, having ceased paying under the 2004 Agreement and seeking to have a written

agreement confirming a final and full settlement figure for the 2004 Agreement of £20,000 instead of £85000 and to close down Excell's relationship with SCK, was accordingly induced by SCK's representations to enter into the contract, that is, that Excell in fact relied upon the representation made by Leigh Blackbourn and the signature purporting to be that of George Blackbourn; and (4) that under its memorandum or articles of association the company was not deprived of the capacity either to enter into a contract of the kind sought to be enforced or to delegate authority to enter into a contract of that kind to the agent.

27.     Under English law, the 2006 Agreement serves as evidence of the course of business between the parties thereto, *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2B 480, such that it confirms that SCK had no further claim to the trademark assigned in the 2004 Agreement.

28.     The result would not be different if American rather than UK law were applied. For example, if one were to apply New York contract law for purposes of interpreting the 2004 Agreement, the burden of proof is on the party seeking to bar admission of parole evidence.

29.     Under New York contract law, Defendants cannot show, as is their burden, that parole evidence is inadmissible because they cannot show that the written contract is an integrated agreement.

30.     The 2004 Agreement does not have the markers of an integrated agreement under New York law. As such, parole evidence would be admissible to prove the complete agreement between the parties.

31.     In that the 2004 Agreement contains no merger clause or even the equivalent thereof, under New York contract law, "the court must determine whether or not there is an integration

`by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'" *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 805 (1983).

32.     Surrounding circumstances may include (*quoting Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp.2d 206, 214 (SDNY 2003) (*quoting*, *Adler & Shaykin v. Wachne*r, 721 F.Supp. 472, 477 (S.D.N.Y.1988)):

> whether the document in question refers to the oral agreement, or whether the alleged oral agreement between the parties is the sort of complex arrangement which is customarily reduced to writing; whether the parties were represented by experienced counsel when they entered into the agreement; whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn out and executed agreement, and whether the condition at issue is fundamental; if the contract, which does not include the standard integration clause, nonetheless contains wording like "in consideration of the mutual promises herein contained, it is agreed and covenanted as follows," and ends by stating that "the foregoing correctly sets forth your understanding of our Agreement."

33.     Applying the aforementioned test, the 2004 Agreement is not an integrated agreement because the document confirms an agreement reached during two meetings and an email and the document itself is a short letter; there is no evidence that the parties were represented by legal counsel, experienced or otherwise; there are no words such as "in consideration of the mutual promises herein contained, it is agreed and covenanted as follows"; nor does it also end with "the foregoing correctly sets forth your understanding of our Agreement"; there is no evidence that the 2004 Agreement was the product of multiple drafts; rather, the draftsmanship is that of a simple letter; the 2004 Agreement does not spell out any of the obligations in detail; and, in that a trademark and associated goodwill can, as a matter of law, be assigned without being

mentioned in a document, the absence of such term cannot be considered a fundamental condition of the 2004 Agreement.

34.     If parole evidence is examined, the evidence is clear that the 2004 Agreement is properly interpreted as at least assigning the SMART CANDLE, SMART CANDLES and SMARTCANDLES trademark along with the associated goodwill.  It is clear that Excell and SCK both understood the sale of the domain name SMARTCANDLES.CO.UK to be an assignment of the trademarks and, by virtue of the course of dealings in connection therewith by SCK and Excell (e.g. page 2 of Exhibit 2), the parties understood the 2004 Agreement to be an assignment of all of SCK's intangible assets including the trademarks along with the goodwill.

35.     Under American contract law, even if parole evidence is excluded, an assignment occurred because SCK discontinued its business and enough assets were passed to Excell that the transaction is such that Excell can continue its business in real continuity with the past.

36.     Considering now the 2002 License, an uncontrolled license is a fraud on the public, inherently deceptive and unlawful and may constitute an abandonment.

37.     A license that contains no provision for quality control by the licensor is defective and void because it is against public policy.

38.     SCK abandoned any rights it may have had in the United States because the 2002 License has no meaningful quality control clauses; rather quality control is sole the responsibility of the Licensee, Excell.

39.     In the absence of quality control provisions, there is no abandonment where the licensor controls the nature and quality of goods sold by a licensee in connection with a trademark.

40.     However, the mere voluntary exchange of information between two companies does not

constitute an adequate exercise of control. While "periodic and thorough inspections by trained personnel" will constitute adequate quality control, mere "chance, cursory examinations of licensees' operations by technically untrained salesmen" may not. *3 McCarthy on Trademarks and Unfair Competition* (4th Ed. updated to 2012), §18:58, at 18-124 [Footnotes omitted.].

41.    SCK abandoned any trademark rights it may ever have licensed under the 2002 License in that SCK did nothing whatsoever to guarantee the quality of Excell's products and never visited Excell's operations or did anything else to guarantee the quality of Excell's products. The rights were abandoned not later than the February 10, 2004, on which date SCK abandoned its US patent application, a date soon after January 10, 2004, when SCK abandoned its application to register SMARTCANDLES in the Patent and Trademark Office.

42.    While US law requires a licensor to control quality, English law, as it relates to ownership of a trademark in the UK, no longer holds that the failure to control quality invalidates UK trademark rights. However, during the era when quality control could result in abandonment of rights, a licensee was not estopped from raising the issue after the license terminated. *Sport International Bussum B. V. v. Hi-Tech Sports Limited*, [1988] R.P.C. 329.

43.    The 2002 License is governed by English law.

44.    US law does not generally estop a licensee from challenging a patent licensor's rights. Lear, Inc. v. Adkins, 395 U.S. 653 (1969).

45.    Moreover, if the technology aspects of the license were successfully challenged, there would be no consideration flowing to the SCK, as royalties were only due only for the use of the technology.

46.    There is no reason for licensee estoppel to apply. The doctrine exists so "that one should

not be permitted to challenge the validity of a trademark while reaping its benefits." *Papercraft Corp. v. Gibson Greeting Cards, Inc.*, 515 F. Supp. 727, 728 (S.D.N.Y. 1981). This doctrine is "'equitable in nature' and is 'not subject to rigid application.'" *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d at 520.

47.    Licensee estoppel is ordinarily not applied to a short term license. *Martha Graham Sch. & Dance Found., Inc.*, 153 F. Supp. 2d at 522 ("[T]he overwhelming number of cases applying the doctrine of licensee estoppel have involved licenses that were in place for a substantial period of time." The 2002 License of July, 2002 had only a short life. It was replaced by its express terms by the December 2004 Agreement.

48.    Licensee estoppel in trademark licenses does not apply with respect to facts learned of subsequent to the termination of a license agreement. *See e.g.*, *Martha Graham Sch. & Dance Found., Inc.*, 153 F. Supp. 2d at 520.

49.    Licensee estoppel should not be applied to the 2002 License because, as an agreement governed by English law (that does not estop a licensee from challenging the licensed rights), there is no policy reason to enforce the doctrine; because Excell did not know that the US patent application had been abandoned and that the UK application had been rejected; because SCK did not own any patent rights or patent applications; because Excell was unaware, prior to the 2004 Agreement, that SCK did not own any tooling; because the actual owner of the patent applications, Leigh Blackbourn, hid his bankruptcy from Excell (and the patent applications from the bankruptcy receiver, which could also have impacted on whether Excell would have paid any further royalties under the 2002 License) and would have impacted substantially upon whether Excell would have invested any money in developing advertising, products and tooling;

and because the licensed trademark constituted only a minor component of the 2002 License in that the 2002 License was, in its essence, a patent license in which there was no obligation to pay a royalty for using the trademark SMARTCANDLES or any other trademark.

50.    Alternatively, the 2002 License is an assignment of SCK's rights in the licensed marks to Excell because "even though a contract states that it is a 'license,' a court will not be governed by form, and the contract will be upheld as an assignment of trademark rights if that is its actual legal effect." 3 McCarthy, § 18:5, at 18-11.

51.    Notwithstanding the title of the 2002 License, the 2002 License is an assignment because it placed the entire onus of advancing use of the supposedly licensed mark and controlling the nature and quality of the goods sold in connection with the mark on Excell, which Excelll did.

52.    The 2004 Agreement superseded the 2002 License in its entirety.  The 2004 Agreement itself states that it replaces the 2002 License.

53.    Any presumption of validity that might relate to the trademark registrations obtained by Structural has been rebutted.

54.    Under US law, even if, hypothetically, Excell had not acquired trademark rights in the SMART CANDLE mark by virtue of the 2004 Agreement, and, hypothetically, if  Structural had been, as between Structural and Excell, the initial user and owner of the SMART CANDLE mark, Structural merged its business activities with those of Excell such that Excell owns the trademark SMART CANDLE by virtue of the merger doctrine.

55.    Under US law, if it had been true that Structural was the first user of the mark, Structural later acted under Excell's license and authority with respect to that mark or otherwise merged its business activities with Excell's worldwide business under that mark, such that when the license

to use the mark license ended, Structural had no right to rely upon its prior independent use as a defense against an infringement claim brought against it by Excell. Structural's prior trademark rights were "merged" with those of Excell and inured to the benefit of Excell.

56. Alternatively, under US law, even if, hypothetically, Excell had not acquired trademark rights in the SMART CANDLE mark by virtue of the 2004 Agreement (or of the circumstances prior thereto), and, hypothetically, even if it were not the case that Structural ever used any such marks under license from Excell, Structural has not shown that it is the first user of the trademark. The 2004 Agreement, which replaces the 2002 License, and/or the surrounding circumstances, manifest an intention by SCK to cease doing any business and not to resume that business and, in fact, the only party that used the mark in the US was Excell. Even if the 2004 Agreement had not been an assignment – although it actually is an assignment –, the 2002 License did not continue (because it was replaced by the 2004 Agreement) and the expression of intent to abandon/intent not to resume use plus the absence of any use by SCK would, in the absence of an assignment, be construed to be an abandonment by SCK such that all use of the SMART CANDLE mark by Excell from the time of the abandonment forward inured solely to the benefit of Excell. There is no credible evidence that SCK sold any goods marked SMART CANDLE prior to the time that Excell made its first use after the hypothetized abandonment.

57. Alternatively, if there had been a manufacturer/distributorship relationship between Excell and Structural where there was no licensing involved and if, which is also not the case, Structural had been an exclusive distributor of SMART CANDLE products, there is still a presumption that the party in the position of the manufacturer owns the trademark. There is no credible evidence that rebuts that presumption in this case. Even if there were, hypothetically, no

such presumption, the evidence shows that Excell owned the trademark: (a) Excell was looked to as the source of goods by customers, (b) customers looked to Excell where there were customer complaints, (c) Structural looked to Excell when there were customer issues, (d), Excell, not Structural, made decisions about the products to be sold, the packaging to be used and the logo to display the SMART CANDLE mark (d), Structural believed that Excell owned the mark and acted accordingly by, *inter alia*, sending Excell distributorship agreement proposals all indicating that Excell owned the trademark and, except for the first proposal, stating that upon termination of the distributorship agreement, Structural would cease using the SMART CANDLE Trademark and (e) Structural did not create the SMART CANDLE mark; instead, Excell created SMART CANDLE (which was derived from the licensed SMARTCANDLES mark). In fact, though, Structural was never an exclusive distributor of Excell's products and, even if that were not the case, Structural was never exclusive to Excell in that Excell continued to sell SMART CANDLE products independently of Structural.

58. To state a claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must show it (1) has a valid trademark entitled to protection and (2) that the defendant's mark is likely to cause confusion in the marketplace.

59. The fact that Structural wrongly registered Excell's trademark SMART CANDLE, claims to own that trademark and even asserts that Excell infringes that trademark shows that SMART CANDLE is a valid, legally protectable trademark; the only question being whether Excell owns that trademark.

60. Excell is the legal owner of the trademark SMART CANDLE.

61. Excell has shown that SCL's use of the SMARTCANDLE mark is likely to cause

consumer confusion. SCL is continuing the business that Structural conducted, using the same trademark that it previously used under license from Excell. The marks and the goods of the companies are the essentially the same and the markets are identical.

62. As a matter of law, a party who once possessed authorization to use the trademarks of its licensor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.

63. It is well-settled that when a licensee's authority to use a trademark has been terminated, any further use of the trademark constitutes trademark infringement and may be enjoined.

64. Alternatively, while this is a license situation, in that Structural used Excell's trademarks with permission and under Excell's control, if that were not the case, Defendants are still liable for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

65. The Second Circuit has articulated eight factors to be considered when assessing the likelihood of consumer confusion in Section 43(a) cases: (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the products or services; (4) the likelihood that the plaintiff will "bridge the gap" and offer a product or service similar to the defendant's; (5) actual confusion between the products or services; (6) good faith on the defendant's part; (7) the quality of the defendant's products or services; and (8) the sophistication of buyers.

66. Applying that law – which, again, is not believed to be applicable because this is a case

involving parties who previously had a license arrangement–, (1) SMART CANDLE is a sufficiently strong mark to have been registered; (2) the marks of the two companies are both SMART CANDLE and, as such, they are essentially identical; (3) the goods are directly competitive in that, at the very least, the goods of the two companies are essentially the same and are for use by the same class of consumers and there is a past history between the two companies whereby goods purchased from Excell's authorized source were sold to consumers under Excell's authority; (4) there is no gap to bridge in that the goods of the two companies are essentially the same; (5) while there has thus far not been actual confusion, this is because Excell's business has effectively been decimated by Defendants' behavior; (6) Defendants have clearly acted in bad faith by continuing to use a mark they believed they did not own and filing applications to register that mark; (7) there is no evidence in the record that SCL has a good quality program in place or even has the knowledge, as Excell has, to maintain the quality of the goods being manufactured for SCL; there is no reason to believe that the consumers of the goods in issue are other than ordinary consumers. Balancing these factors, it is clear that Defendants' continued use of Excell's SMART CANDLE mark is likely to cause confusion.

67.    The unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark.

68.    Alternatively, the very fact of the relationship between the parties is such that the ongoing use by Defendants threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark.

69.    Irreparable harm exists in a trademark case when, as in this case, the party seeking the injunction shows that it will lose control over the reputation of its trademark because loss of

control over one's reputation is neither calculable nor precisely compensable.

70.     Though the harm Excell will suffer in terms of reputation and goodwill cannot be quantified, Excell will be irreparably injured in the absence of a permanent injunction because SCL's products may or may not be of high quality, sold with sufficient care to customer service, or convey the same branding image that has been developed by Excell and because the impression given to consumers by SCL's product, and so the reputation and goodwill of Excell, will not be in Excell's control.

71.     Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Excell for its injuries.

72.     The consuming public has a protectable interest in being free from confusion, deception and mistake.

73.     Excell has also demonstrated that it has no adequate remedy at law because there is no assurance in the record against SCL's continued violation of Excell's trademark rights.

74.     Excell's demonstration of irreparable harm also necessarily demonstrates the inadequacy of legal remedies.

75.     The balance of the hardships weighs in Excell's favor because the only hardship that will befall Defendants in this case is the imposition of an obligation to comply with the law, while Excell faces continued loss of goodwill and ability to exploit the trademark SMART CANDLE that Excell owns if an injunction does not issue.

76.     The public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act.

77.     Because of the likelihood of consumer confusion in this case, the public interest would be

served by the issuance of an injunction, and this factor weighs in Plaintiff's favor.

78.     As such, even if the Patent law standard for issuing an injunction were applied, an injunction would properly issue against SCL and Structural.

79.     Defendants' allegation that Structural had an exclusive distributorship agreement with Excell is barred by the statute of frauds.

80.     Defendants counterclaims are all barred by the doctrines of laches and acquiescence in that Structural, over the course of years, knowingly allowed Excell to sell SMART CANDLE products to third parties and Excell relied on that failure to object, in that Excell continued to sell SMART CANDLE products to third parties.

81.     Because trademark law also involves protecting the public's interests, courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious, or clear, unequivocal and convincing, such as behavior involving perjury and fraud on the court.

82.     Defendants have not shown unclean hands even if their allegations of unclean hands regarding Excell's behavior were proven because such allegations do not describe behavior that is egregious, or clear, unequivocal and convincing.

83.     If, hypothetically, Excell's behavior had been egregious, or clear, unequivocal and convincing, the 2002 License was replaced by the 2004 Agreement no later than December of 2004 such that the alleged behavior does not give rise to a defense of unclean hands on such basis in 2013.

84.     83. If, hypothetically, Excell's behavior had been egregious, or clear, unequivocal and convincing, the allegations related to alleged exclusivity occurred in 2004 – 2005 and do not give rise to a defense of unclean hands on such basis in 2013.

85. "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed.Cir.2009).

86. In establishing fraud, the party must identify a deliberate attempt by the registrant to mislead the Patent and Trademark Office.

87. Structural deliberately attempted to mislead the Patent and Trademark Office into believing that Structural owned and that no other party had the right to use the SMART CANDLE mark by filing false declarations in both applications and by, with respect to its first filed application, claiming, through their attorney, that materials uncovered by the Examining Attorney were the result of Structural's activities.

88. Structural deliberately attempted to mislead the Patent and Trademark Office into believing that Structural was not involved in litigation for purposes of obtaining incontestable rights in its first trademark registration by filing a false declaration claiming there were no claims pending in the Court or in the Patent and Trademark Office when Structural knew there were such actions then pending.

89. The party seeking cancellation must also establish that the deception involved a misstatement of a material fact, meaning a fact that would have affected the Patent and Trademark Office's action with respect the application.

90. Clearly, claiming that one believes oneself to be the owner of the trademark when, in fact, one is not, involves a misstatement of a material fact; likewise, claiming that one believes that no other party had the right to use the SMART CANDLE mark involves a material misstatement of a material fact.

91.     Informing the Patent and Trademark Office that materials uncovered by the Examining Attorney were the result of Structural's activities is also a misstatement of a material fact.

92.     Informing the Patent and Trademark Office that there were no pending lawsuits or Patent and Trademark Office proceedings involving the SMART CANDLE mark and registration when, in fact, there were misstates a material fact in that truth of such averment is a necessary factual predicate to obtaining an incontestable registration.

93.     15 USC 1117(a) provides, in pertinent part:

> When ... a violation under section 43(a) [15 USC 1125(a)] ... shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 USC § §1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

94.     An accounting of profits is appropriate where, as in this case, the "defendant's infringement impl[ies] some connotation of 'intent,' or a knowing act denoting intent, to infringe or reap the harvest of another's mark and advertising."  5 McCarthy on Trademarks, §30:62 at 30-149.

95.     Profits are properly awarded where the infringement is willful or in bad faith.

96.     Attorney's fees are properly awarded in exceptional cases.  Exceptional cases include cases of intentional, deliberate or willful infringement.

97. Under New York unfair competition law, punitive damages are available, where a defendant's conduct, as in the case at bar, has constituted gross, wanton or willful fraud or other morally culpable conduct to an extreme degree.

98. Attorneys fees are properly awarded under the Lanham Act in exceptional cases. In the Second Circuit, wilful and deliberate infringement is sufficient, by itself, to make a case exceptional, thus permitting an award of attorney's fees.

99. To recover costs under Lanham Act Section 35(a), 15 U.S.C. § 1117(a), in a Lanham Act case under Section 43(a), 15 U.S.C. § 1125(a), a plaintiff does not need to establish that the infringer acted maliciously, fraudulently, deliberately or willfully. Lanham Act Section 35(a), 15 U.S.C. 98. § 1117(a), grants a wide field of equitable discretion to award costs.

100. To establish a claim for unfair competition under New York common law, a plaintiff must show either (a) actual confusion or a likelihood of confusion and (b) bad faith on the part of the defendant.

101. The standards for showing federal trademark infringement and unfair competition under New York common law are virtually identical.

102. "In an appropriate case, plaintiff's damages may be measured by the profits lost by plaintiff because of defendant's infringement. To determine what profits plaintiff would have made but for defendant's infringement, the court may use a pre-infringement 'base period' as predicting what plaintiff would have made during the period of infringement." *McCarthy on Trademarks*, §30:79 at page 30-179.

EXCELL CONSUMER PRODUCTS, LTD

By its attorneys,

Dated: April 8, 2013

/s/Neal E. Friedman
Neal E. Friedman (Admitted Pro Hac Vice
Mass BBO No. 1802210)
DAVIS & BUJOLD, P.L.L.C.
112 Pleasant Street
Concord, NH 03301
Tel: (603) 226-7490
Email: patent@davisandbujold.com

/s/Ralph K. Wood
Ralph K. Wood (RW1898)
LAW OFFICE OF RALPH WOOD
399 Knollwood Road, Suite 310
White Plains, NY 10603 -1936
Telephone (914) 761 - 8503