UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------
EXCELL CONSUMER PRODUCTS LTD.,

                **Plaintiff,**

        **- against -**

 

SMART CANDLE LLC, and
STRUCTURAL INTEGRITY PROPERTY
SERVICES, LLC,

                **Defendants.**
-------------------------------------------------------------

11 C 7220 (MEA)
<u>MEMORANDUM OPINION AND</u>
<u>ORDER</u>

**MARVIN E. ASPEN**, United States District Judge:

      Plaintiff Excell Consumer Products Limited ("Excell") commenced this action on

October 13, 2011 against its former distributor, Defendants Smart Candle, LLC and Structural

Integrity Property Services, LLC (collectively, "Structural").[1]  (Dkt. No. 1.)  The parties dispute

ownership of the trademark "Smartcandle" and related designs and logos associated with a brand

of battery-operated electronic candles.[2]  (Joint Pretrial Order, Dkt. No. 28 at 1.)  Excell filed a

---

[1] Defendants state that Structural LLC was a Minnesota limited liability company that
merged on April 13, 2011 into SIPS Acquisition Company, which changed its name to Smart
Candle LLC the same day.  (Def.'s Proposed Findings of Fact ¶ 2.)  Defendants were apparently
doing business as Smart Candle LLC, however, prior to that merger.  (*See, e.g.*, Draft
Distribution Agreement 2008, Pl.'s Ex. 27 (listing company on the signature page as "Structural
Integrity Property Services d/b/a Smart Candle, LLC).)  The amended complaint names the
companies as separate parties, but for convenience, we refer to the two Defendants collectively as
"Structural."

[2] Specifically, Excell challenges Structural's use of "the mark SMART CANDLE in
connection with 'battery-operated electronic controlled light that simulates the flame of a wax
candle.'"  (Joint Pretrial Order, Dkt. No. 28, at 6.)  Structural filed a trademark application for
this mark on February 10, 2005, which matured into a registration on October 17, 2006.  (*Id.*)
Excell also challenges Structural's use of the "Speech Bubble" logo incorporating the name
Smartcandle (Def.'s Ex. III at 6, ¶ 1(c)), which Structural registered as a trademark in 2009.
(Joint Pretrial Order, Dkt. No. 28, at 6.)  Excell originally used two different Smartcandle logos

five-count Amended Complaint alleging willful unfair competition and false or fraudulent

registration under the Lanham Act, 15 U.S.C. § 1051 *et seq*. (Counts I, II and V), unfair business

practices under New York General Business Law § 349 (Count III), and unfair competition under

New York law (Count IV). (Dkt. No. 17.) Structural filed seven counterclaims: trademark

infringement, unfair competition, and counterfeiting under the Lanham Act (Counts I–III),

deceptive acts and practices under New York General Business Law § 349 (Count IV), trademark

infringement and unfair competition under New York common law (Counts V–VI), and unjust

enrichment (Count VII). (Dkt. No. 6.) The parties consented to a bench trial, which we held on

April 16 and 17, 2013. For the following reasons, we enter judgment in favor of Excell.

## LEGAL STANDARD

### I.     The Lanham Act

To prevail on a Lanham Act claim, "a plaintiff must show that it owns a mark deserving

of protection, and that the mark is used in such a way as to create a 'likelihood of confusion' as

to the source or sponsorship of the defendant's goods or services." *Alzheimer's Found. of Am.,

Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 465 (S.D.N.Y.

2011) (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 115 (2d Cir.

2006)). "The central consideration in assessing a mark's protectibility" is "its degree of

distinctiveness." *Louis Vuitton Malletier*, 454 F.3d at 115.

---

(Def.'s Ex. III at 6, ¶ 1(a)–(b)), but eventually phased those out and adopted the Speech Bubble
logo during the course of its distribution agreement with Structural. (*See* Tim Cowley Rule
30(b)(6) Dep. at 20:11–43:8 (describing the use of various Smartcandle logos) (portions entered
into evidence by Structural).) Structural's counterclaims challenge Excell's use of the "Flame"
logo incorporating the name Smartcandle (Def.'s Ex. III at 6, ¶ 1(d)), which Excell adopted after
the termination of its business relationship with Structural (Cowley Rule 30(b)(6) Dep. at
32:13–34:21).

The parties in this case do not argue that the marks at issue lack distinctiveness. Furthermore, Structural has registered the marks (Joint Pretrial Order at 6), which means that they are "presumptively distinctive." *Juicy Couture, Inc. v. Bella Int'l Ltd.*, No. 12 CV 5801, 2013 WL 978773, at *4 (S.D.N.Y. Mar. 12, 2013); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 629 (S.D.N.Y. 2012). Neither do the parties dispute whether there is a "likelihood of confusion." (Pl.'s Proposed Findings of Law ¶ 61 ("Excell has shown that [Structural's] use of the SMARTCANDLE mark is likely to cause consumer confusion."); Def.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 209–247 (analyzing the factors that determine likelihood of confusion).) Therefore, the primary issue before us at trial with respect to liability under the Lanham Act is which party owns the disputed trademarks.

## II.    New York Law

"The elements necessary to prevail on causes of action for trademark infringement and unfair competition" under New York common law "mirror the Lanham Act claims." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 430 (S.D.N.Y. 2012); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005). "However, unlike its federal counterpart, a viable common law claim for unfair competition requires an additional showing of bad faith." *Lorillard Tobacco Co.*, 378 F. Supp. 2d at 456 (citing *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 383 (2d Cir. 2000)); *see also L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11 CV 4187, 2013 WL 4400532, at *21 (S.D.N.Y. Aug. 15, 2013) ("A claim under the Lanham Act, coupled with a showing of bad faith or intent, establishes a claim for unfair competition under New York common law.").

Under New York General Business Law § 349, "the majority view in [the Second] Circuit

3

is that trademark infringement claims are not cognizable . . . unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."  *L'Oreal USA*, 2013 WL 4400532, at *22 (internal citations and quotations omitted); *Coach, Inc. v. Horizon Trading USA, Inc.*, 908 F. Supp. 2d 426, 435 (S.D.N.Y. 2012) (collecting cases).  "For example, an alleged injury of 'confusion and deception of the consuming public . . . is not distinct from the very harm that trademark laws generally seek to redress and thus is not over and above ordinary trademark infringement.'"  *L'Oreal USA*, 2013 WL 4400532, at *22 (quoting *Coach, Inc.*, 908 F. Supp. 2d at 436).

**FINDINGS OF FACT**

## I.     Excell's business relationship with Smartcandle.co.uk Limited

Tim Cowley formed Excell in 2001 to sell a range of electronic products, including batteries, lanterns, and rechargeable flashlights.  (Cowley Decl. ¶¶ 10, 12.)  Excell "shar[ed] resources and contacts" with Powerline (UK), Limited ("Powerline"), a company that Cowley created in 1997.  (*Id.* ¶¶ 8, 10.)  In September 2001, Leigh Blackbourn ("Leigh") of Smartcandles.co.uk Limited ("SCK") made initial contact with Cowley about obtaining a source for batteries.  (Cowley Decl. ¶ 13; Leigh Blackbourn Aff. (Def.'s Ex. CCCC, Pl.'s Ex. 52) ¶ 6.)  Leigh had cofounded SCK with his father, George Blackbourn ("George") and Warwick Adams in 2000.  (Leigh Blackbourn Aff.  ¶ 3.)  Shortly thereafter, SCK developed a line of electronic candle products under the trademarks "Smart Candles" and "Smart Candle" ("Smartcandle Products").[3]  (*Id.* ¶¶ 3, 5.)

--------

[3] During the time period relevant to this lawsuit, the parties appear to have developed or improved upon a number of products under the Smartcandle brand.  We will identify and address individual products as necessary, but we use the term "Smartcandle Products" to refer

A.    *The 2002 License*

In 2002, Excell and SCK entered into a licensing agreement ("2002 License").  (Pl.'s Ex. 1; Cowley Decl. ¶ 17, Leigh Blackbourn Aff. ¶ 6.)  The 2002 License identified certain assets belonging to SCK, including copyrights, manufacturing tooling, trademarks, patent rights, and technical information (defined as "all know-how, experience, drawings, designs specifications, diagrams, computer programs and other technical information relating to the Products. . .").  (2002 License (Pl.'s Ex. 1) § 1.1.)  It granted Excell an exclusive license to (1) manufacture products under SCK's patent, using SCK's copyright and technical information; (2) sell those products; and (3) use SCK's mark, defined as "the trade mark, SMARTCANDLES together with any registrations and applications for registration of such marks as may be obtained by the Licensor from time to time with respect to the Products."  (*Id.* §§ 2.1.1–3.)  It lasted for a period of five years, during which time Excell was obligated to make monthly royalty payments.  (*Id.* §§ 6, 12.1.)

The 2002 License required Excell to "submit samples of all products to be sold at no cost to the Licensor and the Licensor may retain approved samples for quality control purposes."  (*Id.* §§ 8.1.2.)  It further required Excell to "ensure that all Products manufactured and/or sold by or on behalf of the Licensee are free from any material defects of manufacture or components . . ."  (*Id.* §§ 8.1.3.)  Excell did in fact submit samples to SCK for quality control purposes.  (Testimony of Tim Cowley, Trial Tr. vol. 1, 36:20–37:7.)  Excell took additional steps to ensure the quality of the product, including close supervision and direction of factory operations.

---

collectively to any or all of the products bearing the trademark "Smartcandle," regardless of when and by whom they were developed.

(Cowley Decl. ¶¶ 18–19.)  There is no evidence of any problems with production or product quality during the period covered by the licensing agreement.

**B.**     ***The 2004 Agreement***

In the fall of 2004, Leigh transferred all of his shares to George, filed for bankruptcy, and moved to Thailand.  (Leigh Blackbourn Aff. ¶ 9.)  At that time, Warwick Adams took over management of SCK.  (*Id.*)  Cowley contacted Adams in September 2004 to discuss a purchase of SCK's assets.  (Cowley Decl. ¶ 44.)  Excell and SCK came to an agreement at a subsequent meeting.  (*Id.* ¶ 47.)

In December 2004, Warwick Adams drafted a letter to Tim Cowley on behalf of SCK "to confirm our understanding of the agreement reached between our two companies for the sale of our interest in the UK and US patent applications and the domain name, smartcandles.co.uk." (Pl.'s Ex. 2.)  The terms of the agreement were as follows:

1.     Smartcandles.co.uk Limited agrees to sell its interest in the UK patent application number 0109501.7 and its interest in the US patent application number 10/226322 to Excell Consumer Products Limited for the sum of £ 85,000.  This replaces the license agreement dated 24 June 2002.  The £ 85,000 is payable in 48 equal monthly installments by standing order to the Smartcandles.co.uk Ltd bank account.

2.     Smartcandles.co.uk Limited agrees to procure the transfer of the domain name <smartcandles.co.uk> to Excell Consumer Products Limited from Mr. Leigh Blackbourn.

3.     The directors and principle shareholders in Smartcandles.co.uk (Mr. Leigh Blackbourn, Mr George Blackbourn and Mr. Warwick Adams) undertake not to sell, manufacture or distribute any product which may compete with the Smart Candles to be sold by Excell Consumer Products Limited.

4.     In the event that Excell Consumer Products Limited or its successors or assignees are prevented from selling Smart Candles by a prior patent, the obligation to continue payments to Smartcandles.co.uk Limited in 1)

above becomes void.

(*Id.*)  This letter was the entire agreement between Excell and SCK ("2004 Agreement").

(Testimony of Tim Cowley, Trial Tr. vol. 1 at 52:13–53:10.)  There were no other documents

that "embodied or memorialized the agreement that was reached at that time."  (*Id.* at

52:23–53:6.)  Neither were there "any side agreements other than what's stated on the face of the

December 2004 letter."  (*Id.* at 53:7–10.)  Cowley never paid the £ 85,000 that he owed under the

2004 Agreement.  (Cowley Decl. ¶ 61; Leigh Blackbourn Aff. ¶ 14.)

   C.   *The 2006 Agreement*

      In November 2006, Leigh and Cowley negotiated a settlement by which Cowley agreed to

pay £ 20,000, in payments of £ 1,000, in satisfaction of the 2004 Agreement ("2006

Agreement").  (Cowley Decl. ¶ 64; Leigh Blackbourn Aff. ¶ 16.)  Cowley claims that the 2006

Agreement was memorialized in a document dated November 22, 2006.  (Cowley Decl.

¶¶ 65–66; Pl.'s Ex. 14.)  That document provides that "the payment of £ 20,000 is good faith

[*sic.*], and in full an [*sic.*] final settlement of any outstanding claims for ownership, tooling,

commissions, Brand name, copyright, Website,etc, [*sic.*] appertaining to the UK business of

Smart Candles.co.uk [*sic.*]."  (*Id.*)  The signature at the bottom is identified as George

Blackbourn's.  (*Id.*)  There are numerous problems with this document.

      Both George and Leigh Blackbourn testify that they never saw this document prior to this

litigation, and George stated that the signature at the bottom is not in his handwriting.  (Leigh

Blackbourn Aff. ¶ 17–18; George Blackbourn Aff. ¶ 6.)  Excell and Structural both submitted

expert reports concluding that the signature had been forged.  (Expert Report of Jeffery Luber at

3; Expert Report of Janis Tweedy at 5–6.)  Excell's expert opined that Leigh Blackbourn had

7

"probably"[4] forged it.  (Expert Report of Jeffery Luber at 6.)  Leigh testified that the 2006

Agreement was never reduced to writing and did not include the sale of SCK's trademarks.  (*Id.*

¶¶ 16, 19–20.)

Based on the evidence before us, we find that Plaintiff's Exhibit 14 is not a genuine

document memorializing the agreement between the parties.  It is undisputed that the signature is

forged, and we do not believe that the evidence weighs in favor of the conclusion that Leigh

forged it.  In the absence of a valid written agreement, there is insufficient evidence in the record

for us to ascertain the specific terms of whatever agreement Cowley and Leigh negotiated in

2006.

### D.    *The 2010 Agreement*

SCK was administratively dissolved in 2007.  (Leigh Blackbourn Aff. ¶ 21.)

Nevertheless, Cowley continued to make £ 1,000 payments under the 2006 Agreement.  (Cowley

Decl. ¶ 67–68; Pl.'s Exs. 15–17.)  On September 27, 2010, Leigh sent Cowley a letter threatening

legal action unless he made the final  £ 1,000 payment.  (Cowley Decl. ¶ 73, Pl.'s Ex. 20.)

Cowley sent the final payment of £ 1,000 on the condition that Leigh sign an agreement

"prevent[ing] him from having any further claim or dealings with any of my companies or any

party associated with the SMART CANDLE business."  (Cowley Decl. ¶ 72; Leigh Blackbourn

Aff. ¶ 21.)

Excell submitted a document into evidence, dated September 6, 2010, that it claims

_____

[4] "[T]he evidence in contained in the handwriting points rather strongly toward the
questioned and known writing having been written by the same individual [*i.e.*, Leigh
Blackbourn]; however, it falls short of the 'virtually certain' degree of confidence."  (Expert
Report of Jeffery Luber at 6 n.1.)

memorializes this agreement ("2010 Agreement").  (Pl.'s Ex. 19.)  The document is identified as a "Co-operation Agreement" between Leigh "Blackbourne" [*sic.*] and Powerline.  (*Id.*) According to this document, Leigh assigned "all commercial interests in the product known as 'SmartCandle'" for  £ 20,000 "by the form of a document on the 30th November 2006[.]"  (*Id.*) This agreement purports to confirm payment of the final £ 1000 installment and release Powerline from any future claims.  (*Id.*)

The validity of this document is questionable.  Leigh testified that he entered into a "cooperation agreement" on September 6, 2010, which corresponds to the date on the document. (Leigh Blackbourn Aff. ¶ 21.)  But the signature of the person who supposedly witnessed the execution of the document is dated May 10, 2010, almost four months before the date of the agreement.  (Pl.'s Ex. 19.)  We also find it odd the Leigh's last name is repeatedly misspelled. (*Id.*)  Nevertheless, we do not definitively conclude, from this limited evidence, that the document is false or fabricated.  We will consider it as evidence in our conclusions of law below.

## II.    Excell's business relationship with Structural

The somewhat convoluted business relationships and various agreements between the parties and their principals, hardly a model for commercial efficiency, makes the task of sorting out and analyzing their respective claims all the more challenging.

Shane Vail and Joshua Kutzler were employees at Rasmussen Import Company ("Rasmussen"), a giftware wholesale company.  (Vail Aff. ¶ 2; Kutzler Aff. ¶ 2.)  They formed Structural as a side business in 2003 to supplement their incomes with odd jobs, such as building store fixtures, decks and fences, and clearing land.  (Vail Aff. ¶ 2; Kutzler Aff. ¶ 13.)  As of 2004, Rasmussen was a U.S. distributor of Smartcandle products that it purchased through

Excell.  (Kutzler Aff. ¶ 4.)  At that time, Kutzler began developing an idea for a retail website to sell directly to consumers the battery-operated candles that Rasmussen supplied on a wholesale basis.  (*Id.* ¶ 6.)  Kutzler raised the idea of a retail website to Cowley in the summer of 2004. (Kutzler Aff. ¶¶ 5–6; Def.'s Ex. J.)

At the end of the summer 2004, Kutzler began to explore options for leaving Rasmussen, because it was cutting his pay.  (Kutzler Aff. ¶ 12.)  He approached Vail about developing the website as part of their existing side business, Structural.  (*Id.* ¶ 13; Vail Aff. ¶ 2.)  By August, Vail and Kutzler were developing the business as web-based distribution company rather than an online retailer.  (Kutzler Aff. ¶ 15; Def.'s Ex. O.)  To that end, they engaged a marketing company by the name of Play to develop a marketing plan consisting of a new logo and designs for packaging, trade shows, business cards and a website.  (Kutzler Aff. ¶ 18; Pl.'s Ex. 202 (record of Structural's expenditures with Play in September 2004).)  Vail and Kutzler met with Cowley on October 1, 2004 to present him with their marketing plan.  (Kutzler Aff. ¶¶ 20–23; Vail Aff. ¶ 3; Cowley Decl. ¶¶ 84–85.)

A.     ***The 2004 Distribution Agreement***

At the October 2004 meeting, the parties orally agreed that Structural would distribute Smartcandle Products in the U.S.  ("Distribution Agreement").  (Kutzler Aff. ¶ 23; Cowley Decl. ¶ 85.)  They strenuously dispute whether it was an *exclusive* distribution agreement.  Structural is the party claiming that exclusivity was a term of the oral agreement; it therefore bears the burden of proof on that issue.  *Nat'l Commc'ns Ass'n Inc. v. AT & T Corp.*, 238 F.3d 124, 131 (2d Cir. 2001) ("The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.")  For the following reasons, we find that Structural has

10

not met this burden.

Structural acknowledges that it originally sought a non-exclusive distribution agreement during preliminary discussions with Excell in the summer of 2004.  (Email from Kutzler to Cowley, September 2, 2004, Def. Ex. Q at 2, ¶ 4 ("We don't expect exclusive rights to sell smart candle but we are hoping for assurance that the number of distributors will be limited to Dorcy, Dept 56, and Smart Candle LLC [*i.e.*, Structural].").)  But Kutzler testifies that by the October 2004 meeting, the parties had changed their position and reached an agreement that Structural's distributorship would be exclusive.  (Kutzler Aff. ¶ 23.)  Vail offers similar testimony in his affidavit (Vail Aff. ¶ 5), but he was far more equivocal in the portion of his deposition that Excell entered into the record (Trial Tr. vol. 2 at 169:4–20).  When asked if Structural ever became the exclusive distributor, Vail answered, "I don't know if that was ever—I guess I don't know.  Besides my feelings [that we did become an exclusive distributor], I would say that I don't know.  (*Id.* at 169:19–20.)  Cowley flatly denies that he reached an exclusive distribution agreement with Structural at the October 2004 meeting or thereafter.  (Cowley 2d Decl. ¶ 42.)

The evidence supporting the witness testimony is inconclusive.  Prior to the October 2004 meeting, Excell had distribution agreements with Dorcy and Department 56.  (Cowley Decl. ¶¶ 34–35; Def.'s Ex. Q.)  It also had a relationship with Rasmussen, Kutzler and Vail's former employer, but they had not done any substantial business for some time prior to the October 2004 meeting between Excell and Structural.  (Cowley 2d Decl. ¶ 12–14, 44.)

In the September 2, 2004 email quoted above, Kutzler and Cowley discussed the status of Excell's relationship with its other distributors.  (Def.'s Ex. Q.)  Cowley stated that the product Excell sold to Department 56 "was unique to them so I don't see any problems in this

11

relationship." (*Id.*)  Other evidence confirms that Department 56 sold Excell's products under

the mark "Safe T Candle," not Smartcandle.  (Pl.'s Ex. 119 (summary of Dept. 56's orders from

Excell 2004–07).)  Cowley further stated that Dorcy would not continue to sell Excell's products,

because it "just does not have the manpower to push it."  (Def.'s Ex. Q.)  Shortly after the

October 2004 meeting, Structural purchased all of Dorcy's remaining stock of Smartcandle

Products and obtained sales leads from them.  (Kutzler Aff. ¶ 25; Vail Aff. ¶ 7; Def.'s Exs. DD,

V.)  Thus, simply by a process of elimination, Structural appeared to be the only remaining

distributor selling Smartcandle Products in the U.S., which supports their testimony that the

agreement was exclusive.

Prior to the October 2004 with Structural meeting, however, Excell was in negotiations

with the retailer Plow & Hearth, through Bridgehouse, a U.K. buying agent, to place Smartcandle

Products in Plow & Hearth's catalogue.  (Pl.'s Ex. 243)  Either Bridgehouse or Plow & Hearth

raised the issue of exclusivity, and Excell[5] responded that "we are not in a position to guarantee

exclusivity in catalogues.  You are already aware of our working with Department 56 and we also

have some other distribution in the USA into the candle market."  (Email from Tim Barber to

Simon Wigglesworth, March 8, 2004, Pl.'s Ex. 243 at 2–3.)  The day before Excell's meeting

with Structural, an employee of Bridgehouse forwarded Cowley an email from Plow & Hearth

stating that "the Merchandising staff of Plow & Hearth has selected one/several of your products

to be featured or is already featured in our catalogues or retail stores."  (Email from Charlotte

---

[5] This email is from Tim Barber, who, based on his email addresses, appears to be an
employee of both of Cowley's companies, Excell and Powerline.  (Pl.'s Ex. 243 at 1–2.)  As we
explain further below, the relationship between Powerline and Excell, beyond the fact of their
common ownership, is not clear.

Larsen to Tim Cowley, September 30, 2004, Pl.'s Ex. 243 at 4.)

It seems very unlikely that Excell would negotiate a non-exclusive deal with Plow &
Hearth and then immediately turn around and make an exclusive deal with Structural.
Nevertheless, it appears that Excell did not inform Structural about the Plow & Hearth deal at the
October 2004 meeting.  Kutzler testified that he "learned for the first time on February 24, 2005,
that Plaintiff had apparently supplied one specific product model (a 4-pack) to a mail order
company by the name of Plow & Hearth when my wife received her catalogue."  (Kutzler Aff. at
¶ 33.)  Cowley testified that he is "confident that [he] informed Messrs. Vail and Kutzler of
Excell's intention to supply Plow & Hearth with Excell's SMART CANDLE products at or
around the time of the aforesaid meeting in 2004."  (Cowley 2d Decl. ¶ 41.)  But at trial, he
acknowledged that he could not specifically remember having a conversation with them about
Plow & Hearth.  (Trial Tr. vol. 1 at 79:11–21.)  An email from Kutzler to Cowley in February
2005 supports Kutzler's testimony that he learned about the Plow & Heath sales at that time.
(Def.'s Ex. DD.)  The balance of the evidence supports a finding that Cowley did not inform
Kutzler and Vail about the Plow & Hearth deal at the October 2004 meeting.  This fact raises the
possible inference that Cowley was acting deceptively or in bad faith, by agreeing to an exclusive
deal with Structural while selling to Plow & Hearth on the side.

Structural's reaction to learning about the Plow & Hearth deal, however, casts doubt on
their claim that they had an exclusive deal in October 2004.  In the February 2005 email, Kutzler
does not appear to be asserting his rights as an exclusive distributor, but rather expressing
uncertainty regarding Structural's status.  (Def.'s Ex. DD ("Would I be correct in assuming that if
P&H sells through the 1500 sets they have and wish to reorder that they would be directed to

work with us for future business?").)  Moreover, Kutzler seems far less concerned about exclusivity than the fact that Plow & Hearth was selling the product for less that Structural could, following their purchase of Dorcy's stock.  (*Id.* ("If we didn't have the inventory, we would not be as concerned.").)  Finally, instead of claiming a right distribute the product to Plow & Hearth, or demanding some portion of those sales, Kutzler requested factory credit that would allow them to match Plow & Hearth's price.  (*Id.*)  Therefore, this email weighs against the conclusion that the parties had an exclusive agreement.

A second string of emails regarding Plow & Hearth reinforces the impression that the parties had not come to an agreement that Structural would be an exclusive distributor.  (Def.'s Ex. II.)  Vail appears to be relaying a message from a "supplier in Oregon" regarding the Plow & Hearth sales.  (*Id.* at 2.)  Cowley responded that "[t]he only option you have at this stage is to probably re-align the 4-set, and keep your margin in the Food and Beverage sector with the 12 set and the 24/48 set as and when it becomes available."  (*Id.* at 1.)  Although the complete context of the email is not clear, he seems to be suggesting that Structural temporarily bring its prices in line with Plow & Hearth on a particular product.

Kutzler responded that a "[b]etter solution is they buy from us versus buying direct.  If you continue to sell direct without us in the loop you will undermine the entire sales structure as we are already seeing."  (*Id.*)  As with the February 2005 email, here Structural does refer back to an earlier exclusivity agreement or assert that it has a definitive right to handle the Plow & Hearth sales.  Instead, it says it would be the "better" option for Plow & Hearth to buy from Structural, in order to maintain price consistency.  (*Id.*)  It sounds like Structural is still trying to persuade Excell at that point to give them an exclusive arrangement.  Significantly, Cowley did

14

not appear to even consider it an option to transfer Plow & Hearth sales to Structural.  (*Id.* at 1–2.)

More puzzling is the fact that the parties apparently never resolved this situation.  A summary of Excell's sales to "Direct Accounts USA" shows that Excell did hundreds of thousands of dollars in sales to Plow & Hearth from 2004 to 2008.  (Pl.'s Ex. 5.)  Moreover, beginning in 2007, Excell opened four other direct accounts in the U.S.  (*Id.*)[6]  Despite learning of the Plow & Hearth sales in 2005, the evidence does not show that Structural took steps to ensure that Excell's direct sales to the U.S. stopped.

As late as 2009, when the issue of direct sales came up again, Kutzler responded that "it is our understanding that we were to receive some compensation or percentage of this business activity."  (Email from Kutzler to Cowley, December 29, 2009, Def.'s Ex. WW at 2.)  This is an extraordinarily vague request.  At that point, the parties had been doing business together for five years, during which time Excell consistently maintained multiple separate direct accounts (Pl.'s Ex. 5), but they apparently had come no closer to a specific agreement on how to handle that arrangement other than paying "some compensation" to Structural.  At that point, Cowley suggested that Structural simply take over the direct accounts, which had become "more of a headache to the factory than a benefit."  (Def.'s Ex. WW at 1.)  This response seems more indicative of an ongoing negotiation than a definite agreement.  Therefore, this exchange does not support the conclusion that the parties reached an exclusive deal in October 2004.

---

[6] Structural makes the argument that Excell never sold to other distributors, only retailers. (Kutzler Rebuttal Aff. ¶ 3.)  That does not change our opinion on this issue.  The purpose of an exclusive distribution agreement, as we understand it, is for the distributor to handle all the sales in a given territory.  The fact that Excell was making sales to multiple retailers independently of Structural therefore weighs against a finding of exclusivity.

Nevertheless, Cowley made statements that may support the existence of an exclusive agreement with Structural.  In the May 2005 email, he assured Kutzler that "we have not entered into any new discussions with any other American customer since our original meeting."  (Def.'s Ex. II.)  That statement could represent an assurance to Structural of its exclusivity.  On the other hand, the main concern in this series of emails is the consistency of the price structure, so Cowley may have simply been pointing out that there were no other outstanding deals that would undercut Structural's pricing.

More pointedly, Cowley wrote to Rasmussen in January 2005 that Excell "entered into a new exclusive trading agreement for the USA, and this is the reason that I am writing to inform you, that with the effect of the 20th January 2005 [*sic.*], the new agreement came into force."  (Def.'s Ex. CC.)  Kutzler points to this email as confirmation of Structural's exclusive agreement with Excell.  (Kutzler Aff. ¶ 32.)  According to Cowley, however, he was concerned that Vail and Kutzler's departure from Rasmussen and subsequent deal with Excell (a former Rasmussen client) might give "rise to the potential for acrimony."  (Cowley 2d Decl. ¶ 44.)  Therefore, "to avoid giving Rasmussen the impression that the termination of Excell's relationship with it was related to Mr Kutzler or Mr Vail's respective departures, [he] used Rasmussen's knowledge of Excell's relationship with Department 56 as a pretext" for terminating Excell's relationship with Rasmussen "due to a new exclusive trading agreement."  (*Id.* ¶ 45.)

This explanation is somewhat strained.  But if the "new exclusive trading agreement" referred to the deal between Structural and Excell, there's no apparent reason why Cowley would explain, in the preceding paragraph, the success that Department 56 had achieved in the previous quarter.  (*Id.*)  Neither is it clear why he would write that the new deal "came into force" in

16

January 2005, when the parties reached their agreement in October 2004.  (Def.'s Ex. CC.)  It is at least possible that Cowley was fabricating a pretext to end his relationship with Rasmussen, as he testified.  Accordingly, we do not find this email to be conclusive evidence that Structural and Excell reached an exclusive agreement in October 2004.

Weighing the evidence on this issue, we find that Structural has not met its burden of proving the existence of an exclusive agreement.  Without a doubt, the absence of a written agreement in this case severely obscures the exact nature of the parties' relationship.  Under the circumstances we can only evaluate the record in an attempt to discern what the parties said at a meeting in 2004.  And the record before us does not prove, by a preponderance of the evidence, that the parties agreed to an exclusive distributorship at that time.

### B.    *Structural's good faith belief in its ownership of the trademark*

In our conclusions of law below, we decide that Excell is the owner of the disputed trademarks, based in large part on Structural's position as a non-exclusive distributor.  The extent of Structural's liability depends in part on whether it acted in bad faith.  We find that Structural operated under the good faith belief that it was the owner of the trademark, with no intent to deceive or cause confusion.

Before the parties reached a distribution agreement in October 2004, Structural inquired whether the trademark was registered.  (Def.'s Ex. K.)  Cowley informed them that he had filed an application in 2004, but it was denied.  (*Id.*)  There is no evidence that Excell ever made further attempts to register the Smartcandle trademark in the U.S.  Meanwhile, Structural was committing time and resources to developing a new logo, packaging materials, and marketing plans. (Kutzler Aff. ¶¶ 14, 18–20.)  Given Excell's apparent failure to protect the trademark in

17

the U.S., Structural sought to protect its investment in the brand by filing applications for trademark registrations in its own name.  (Vail Aff. ¶ 10 ("As there was no federal trademark registration for the SMART CANDLE mark in the U.S., we felt it was important to file a registration to protect our U.S. brand and business and move forward with our business plan.").)

Vail testified that he notified Cowley before filing the applications, and that Cowley orally gave him permission.  (*Id.* ¶¶ 10–11.)  Cowley disputes this, but we find Vail's testimony on this point more credible.  Moreover, in a later email, Cowley wrote "If we look back I allowed you the approval to register the domain in America, and also to support you in the registration of the Trade mark in America . . ."  (Email from Cowley to Kutzler, March 1, 2010, Def.'s Ex. YY.)  We believe this email supports Vail's testimony on this point, and disbelieve Cowley's testimony that this email refers to Canadian trademark applications.  (Cowley Decl. ¶ 139.)

Over the course of the parties' seven year business relationship, Structural consistently invested time and resources into building the brand.  (*See, e.g.*, Pl.'s Ex. 221; Pl.'s Ex. 252 at 10–13; Def.'s Ex. VV (email chains discussing various expenses Structural incurred developing the brand and negotiations over the allocations of those expenses).)  Their efforts were largely responsible for the success of Smartcandle Products in the U.S.—Structural's sales increased from $447,900 in 2005 to over $1,740,296 in 2010 (Pl.'s Ex. 270), while Excell's direct sales to retailers was far more modest, reaching a high of $330,024 to Plow & Hearth in 2005, and largely stagnating or declining thereafter (Pl.'s Ex. 5).[7]

Indeed, Cowley fully recognized Structural's role in building the brand.  In July 2009, as

---

[7] This excludes Excell's sales to Department 56, who sold the products under a different label, and KBK, who sold the products outside of the U.S.

the parties were attempting to clarify their relationship, he wrote to Kutzler and Vail that the "asset of Smartcandle, Inc. [*i.e.* Structural] is in the business itself, your customer database, knowledge, brand building, sales etc, this is a cost that you have invested in to develop the sales, and hopefully will continue to develop. (Email from Cowley to Kutzler and Vail, July 6, 2009, Pl.'s Ex. 213 at 6.)  Later in the same email exchange, he wrote that "the investment you have made to date financially and time [*sic.*] has had a positive effect to the development of your business without this effort and dedication that Smartcandle inc would not be as it is today." (Email from Cowley to Vail, July 9, 2009, Pl.'s Ex. 213 at 2.)

In light of Cowley's awareness and approval of Structural registration of the trademarks in the U.S., and Structural's investment in building the brand, we find that Structural had valid reasons to believe in good faith that it owned the trademark.  In fact, when the parties' relationship began to break down in 2010, they appear to have initially negotiated about the U.S. trademarks on the basis that Structural owned them.  Cowley communicated with Vail about "transferring legal ownership of the trademarks."  (Email from Cowley to Vail, May 13, 2010, Pl.'s Ex. 218 at 4.)  This statement implicitly assumes that Structural owned the trademarks, because otherwise it could not transfer ownership.  Vail responded that Cowley's "suggestion of us giving you the brand and trademarks that we own and have developed at great expense as the first step, will not occur outside and separate from resolving the other matters and issues." (Email from Vail to Cowley, June 10, 2010, Pl.'s Ex. 220 at 1.)  Far from being willfully deceptive or acting in bad faith, Structural clearly expressed its position that it owned the trademarks, a position grounded in its registrations and it efforts to build the brand.

A final indicia of Structural's good faith is its repeated attempts throughout the parties' business relationship to memorialize their agreement in writing.  Structural sent numerous draft contracts that would have settled many of the issues that later became points of conflict between that parties, including exclusivity and ownership of the trademarks.  (Def.'s Ex. GG (email re: a 2005 draft agreement); Def.'s Ex. HH (2005 draft agreement); Pl.'s Ex. 24–29 (draft agreements from 2007–09 and emails concerning those drafts).)  Excell inexplicably delayed execution of a written agreement indefinitely, and thus stands responsible for much of the confusion that later arose concerning many aspects of the parties' business relationship.  Given Cowley's refusal to commit to any clear, written allocation of trademark rights (or any other rights and obligations) between the parties, Structural took the reasonable step of protecting its investment in the brand by registering the trademark.

Under these circumstances, we find Structural's assertions of trademark ownership to be reasonable and in good faith, although ultimately erroneous.

## CONCLUSIONS OF LAW

I.      **Excell's claim of trademark ownership**

Excell seeks to prove its ownership of the disputed trademark on three alternative grounds.  First, it claims to have acquired the trademark as a licensee of SCK during the period covered by the 2002 License.  (Pl.'s Proposed Conclusions of Law ¶¶ 36–41.)  Second, it argues that it purchased the trademark with SCK's related business assets in the 2004 Agreement (*Id.* ¶ 11.)  Third, it claims that it acquired the trademark through its own use after SCK abandoned the trademark.  (*Id.* ¶ 56.)  We hold that Excell has failed to prove ownership based on the first two grounds, and hold that Excell acquired trademark rights no earlier than 2007 as a result of

SCK's abandonment.

A. *The 2002 licensing agreement between Excell and SCK*

Excell claims that it acquired rights in the trademark as SCK's licensee, because the 2002 License gave SCK no contractual right to exercise any control over the quality or production of Smartcandle Products, and SCK never attempted to exercise control during the period covered by the agreement.  (Pl.'s Post-Trial Br. at 1–2.)

As a general rule, a licensee's use of a trademark inures to the benefit of the licensor. 3 *McCarthy on Trademarks and Unfair Competition* § 18:52 (4th ed.);  *Hawaii-Pac. Apparel Grp., Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506 (S.D.N.Y. 2006) ("Use of the mark by a licensee to identify or distinguish goods is sufficient to create enforceable rights in favor of the licensor.").  But a licensor "is required to exercise some degree of control over the use of the mark by the licensee, at the risk of abandonment of the mark." *Hawaii-Pac. Apparel Grp.*, 418 F. Supp. 2d at 506; *see also Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253, 259 (2d Cir. 2002).  "Where a licensor retains no control over the nature or quality of goods or services provided in connection with the mark . . . such 'naked licensing' will result in abandonment." *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir. 1959).  Excell must meet a "high burden of proof," however, in order to succeed on its claim that SCK abandoned its trademark rights by failing to exercise sufficient quality control.  *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 334 (2d Cir. 1983); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010).

The only evidence on this issue is Cowley's testimony and the 2002 License itself.

According to Cowley, SCK did not engage in any sort of quality control:

> At no time did anyone from SCK inspect or even visit Excell's facilities for
> quality control purposes. At no time did anyone from SCK ever inspect or visit the
> company that Excell had hired in China, Keiyo, to manufacture the goods sold by
> Excell in connection with the trademarks. At no time did anyone from SCK ask to
> examine or inspect products actually being sold by Excell.

(Cowley Decl. ¶ 29.)  Nevertheless, as we discussed above, Cowley submitted samples to SCK

for quality control purposes, as he was obligated to do under the terms of the 2002 License.

(Testimony of Tim Cowley, Trial Tr. vol. 1, 36:20–37:7; Pl.'s Ex. 1 §§ 8.1.2.)  The issue,

therefore, is whether requiring Excell to send product samples maintained sufficient quality

control for SCK to retain its ownership of the trademark.

The "critical question" in deciding this issue is "whether the licensees' operations are

policed adequately to guarantee the quality of the products sold under the mark."  *General*

*Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986); *Patsy's Italian*

*Rest., Inc.*, 508 F. Supp. 2d at 212.  There is no clear, generally applicable standard that

determines whether a licensor's level of control is sufficient.  *See McCarthy* § 18:55 ("It is

difficult, if not impossible to define in the abstract exactly how much control and inspection is

needed to satisfy the requirement of quality control over trademark licensees.").  Instead, courts

make a fact-specific inquiry that takes into account such factors as the skill and experience of the

licensee, the complexity of the product, and consumer expectations of the product's quality.  *See*

*Restatement (Third) of Unfair Competition* § 33, comment c (1995) ("Cases both under the

[Lanham] Act and at common law apply a flexible standard responsive to the particular facts of

each case . . .")  The focus and ultimate purpose of this inquiry is the protection of

consumers—the sufficiency of a certain level of quality control "is determined by the

expectations that the licensee's use of the mark creates in consumers and the supervision that is reasonably necessary to insure that those expectations are not endangered." *See id.*

In this case, the Smartcandle Products covered by the 2002 License were relatively simple pieces of electronics with a modest purpose. They were designed to resemble a candle and produce a flickering light. (Cowley Decl. ¶ 18.) Consumer expectations of the products' quality must have been likewise modest—as long as the products approximated the appearance of a candle and flickered, they would likely satisfy consumers. Cowley testified to the quality control measures that Excell developed and adopted, including close supervision and direction of factory operations. (*Id.* ¶¶ 18–19.) This testimony indicates that he fulfilled his obligations under § 8.1.3 of the 2002 License to ensure the quality of the products.

Under these circumstances, we believe that periodic review of product samples was a sufficient level of quality control to maintain SCK's ownership of the trademark. Reviewing samples allowed SCK to monitor the appearance and functionality of the product. Given the product's relative simplicity and the lack of evidence pointing to any problems with quality, greater measures of control, such as inspections of the factory or Excell's facilities, were not necessarily warranted. The court in *Hawaii-Pacific Apparel Group* found a similar level of quality control sufficient to preserve the licensor's ownership of a disputed trademark. 418 F. Supp. 2d at 507. In that case, the National Football League and the Cleveland Browns licensed certain companies to use the "DAWG POUND" mark on approved merchandise. *Id.* Like the 2002 License, the agreement at issue in *Hawaii-Pacific Apparel Group* held the licensee responsible for ensuring quality standards, while submitting samples for review by the licensor. *Id.* at 507 n.9.

23

Therefore, based on the limited evidence before us, we hold that Excell has failed to meet the high burden of proof required to succeed on its claim that SCK abandoned the trademark by failing to exercise adequate quality control under the terms of the Licensing Agreement.

**B.**   ***Assignment of the trademark***

Excell argues in the alternative that it purchased SCK's trademark rights, along with the rest of SCK's intellectual property assets, in the 2004 Agreement, which was superseded by the 2006 Agreement.  (Pl.'s Proposed Findings of Fact ¶¶ 50, 74–77.)  Structural disputes that the 2004 Agreement included an assignment of trademark rights (Def.'s Proposed Findings of Fact ¶¶ 50–62) and challenges the validity of the 2006 Agreement (Def.'s Post-Trial Resp. Br. at 3).

**1.**   <u>**The 2004 Agreement**</u>

*a.*   *The 2004 Agreement did not assign SCK's trademark to Excell.*

According to Excell, the "assignment of the www.smartcandle.co.uk domain to Excell [in the 2004 Agreement] signified that Excell had acquired all of the exclusive rights connected with the use" of SCK's trademarks.  (Pl.'s Proposed Findings of Fact ¶ 53; Cowley Aff. ¶ 51.) Structural argues that the 2004 Agreement does no more than transfer the three specific assets listed; there is no reason to interpret the domain name as the embodiment of all of SCK's intellectual property rights.  (Def. Post-Trial Br. at 5.)  For the following reasons, we agree with Structural.

We begin our analysis of the 2004 Agreement with two preliminary questions: (1) what law applies to the interpretation of the 2004 Agreement; and (2) whether the December 2004 letter from Adams to Cowley ("December 2004 Letter") (Pl.'s Ex. 2 at 1) represents the complete agreement between the parties.  On the first point, the parties agree that English law should apply

24

to the interpretation of the 2004 Agreement, because it is a contract "between UK citizens and the only subject matter of the contract located in the U.S. was a patent application."  (Def.'s Post-Trial Br. at 2 (applying the "center of gravity test" under N.Y. law to argue for the application of English law to the contract); Pl.'s Proposed Findings of Law ¶¶ 12–24 (interpreting the contract under English law).)  The parties dispute the second point.

### i. The December 2004 letter is the complete agreement between Excell and SCK

Excell seeks to prove that the December 2004 Letter is not the complete agreement between the parties, because it is an informal document drafted without the benefit of legal counsel, and it contains no merger or integration clause.  (Pl.'s Proposed Findings of Law ¶¶ 28–33.)  Accordingly, it argues that we should admit extrinsic evidence.  (*Id.* ¶ 34.)  Excell pursues this argument under New York law (*Id.* ¶ 29), despite its own assertions that English law governs the contract.  Presumably, Excell intends to make this argument in the alternative, in the event that we decided not to apply English law.

In any case, the resolution of this issue is straightforward.  As Structural correctly points out, a lack of formalities in a written draft does not mean the agreement is incomplete.  (Def.'s Post-Tr. Resp. Br. at 2–3.)  *See Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 214 (S.D.N.Y. 2003).  Instead, the dispositive question is whether the parties to the agreement intend it to be complete.  *Id.*  Here, Cowley's testimony and the terms of the letter itself convince us that Excell and SCK intended the December 2004 letter to be the complete agreement between them.

As we pointed out above in our findings of fact, Cowley testified on cross-examination

that the December 2004 Letter was the entire agreement between Excell and SCK.  (Trial Tr. vol. 1 at 52:13–53:10)  There were no other documents that "embodied or memorialized the agreement that was reached at that time."  (*Id.* at 52:23–53:6)  Neither were there "any side agreements other than what's stated on the face of the December 2004 letter."  (*Id.* at 53:7–10.)

Furthermore, "[i]f the written document appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement then it constitutes the contract between them, and is presumed to contain the whole of that contract."  *Morgan Stanley*, 269 F. Supp. 2d at 214 (internal quotes omitted).  The December 2004 Letter contains enough information to be a complete contract.  (Pl.'s Ex. 2 at 1.)  Like the agreement in *Morgan Stanley*, it "specifies the identity of the parties, what was to be sold, how the sale was to occur, when the sale was to take place, and the purchase price."  *Id.* at 215.  Accordingly, the December 2004 Letter appears to be a complete agreement on its face.

Cowley's testimony, together with the terms included in the document itself, lead us to conclude that the December 2004 Letter expresses the entire 2004 Agreement between Excell and SCK.  We turn to the interpretation of that agreement under English law.

### ii.  Contract interpretation under English law

The case *Investor's Compensation Scheme, Limited. v. West Bromich Building Society* [1998] 1 WLR 896, sets forth the generally accepted principles of contract interpretation under English law.  *See also Chartbrook Ltd. v. Persimmon Homes Ltd. and Others* [2009] 1 AC 1101 ("There is no dispute that the principles on which a contract . . . should be interpreted are those summarized by the House of Lords in Investor's Compensation Scheme Ltd v. West Bromich Building Society[.]").

According to those principles, the correct interpretation of a contract is the "meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." *I.C.S.*, 1 WRL at 912.  Background knowledge includes "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man," *except* for "negotiations of the parties and their declarations of subjective intent." *Id.* at 912–13.  The meaning of the document is "not the same thing as the meaning of its words." *Id.* at 913.  Instead, the "meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean." *Id.*  Generally, words "should be given their natural and ordinary meaning," but "if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had." *Id.*

We begin with the language of the agreement itself.  The letter repeatedly identifies the assets being transferred as two patent applications and a domain name.  (Pl.'s Ex. 2 at 1.)  In ordinary usage, the terms "patent application" and "domain name" do not signify or represent the entirety of a company's intellectual property beyond those specific assets themselves.  In other words, "domain name" ordinarily just refers to a company's domain name, not the domain name plus the rest of that company's intellectual property.

Nevertheless, it is precisely Excell's contention that the assignment of the domain name "signified that Excell had acquired all of the exclusive rights connected with the use of [SCK's Smartcandle] trademarks." (Pl.'s Proposed Findings of Fact ¶ 53.)  In accordance with the

principles of interpretation set forth in *I.C.S.*, we look to the relevant background knowledge available to Excell and SCK at the time of the contract to determine what the letter would convey to a reasonable person.  1 WRL at 912–13.

        iii.  <u>The background information relevant to the 2004 Agreement</u>

We begin by identifying the scope of the relevant background knowledge.  Structural correctly points out that Excell and SCK would certainly have been aware, at the time of the 2004 Agreement, of the terms of the 2002 License and the assets identified therein.  (Def.'s Post-Trial Br. at 5.)  Cowley's testimony confirms as much.  (Trial Tr. vol. 1 at 49:6–15)  Accordingly we consider the 2002 License part of the relevant background.

Excell asks us to further consider "the financial condition of SCK and its need to wind up its business."  (Pl.'s Post-Trial Br. at 4–5.)  The evidence on this point, however, is contradictory.  By the fall of 2004, Leigh Blackbourn had moved to Thailand and transferred his shares in SCK to his father, George, who in turn passed the management of the company to Warwick Adams.  (Leigh Blackbourn Aff. ¶ 9; Cowley Aff. ¶ 49; Def.'s Ex. S.)  Cowley testified that Adams informed him "the SCK was looking to wind up its business because the company was insolvent."  (Cowley ¶ 44.)  If it were true that SCK was winding up in 2004, it might indicate that they intended to transfer all of their assets.  But Adams' statement on this point is hearsay, and other evidence indicates that SCK intended to continue doing business at the time of the 2004 Agreement.

Leigh Blackbourn testified that SCK was administratively dissolved in June 2007 (Leigh Blackbourn Aff. ¶ 21), and Cowley states that to his knowledge, it existed until February 2007 (Cowley Aff. ¶ 67).  In either case, SCK remained in existence for over two years after the 2004

Agreement.  According to Leigh Blackbourn, at the time of the 2004 Agreement, SCK had plans

to develop new lighting products, using the funds from the 2004 Agreement as "seed money."

(Leigh Blackbourn Aff. ¶ 11.)  Leigh's apparent lack of involvement in the company at that point

diminishes the strength of his testimony, but his statement is consistent with the fact that the

company continued to exist until 2007.

Additionally, there is a letter dated January 14, 2005 to Cowley from Jeff Mumby, an

accountant acting on behalf of SCK.  (Def.'s Ex. FFFF [W&W No. 2035].)  The letter asks

Cowley to sign a copy of the 2004 Agreement that had been signed by SCK, and includes a

number of documents related to the transfer of the domain name.  (*Id.*)  It also conveys a request

from George and Leigh "for some samples of the finished product."  (*Id.*)  There is no apparent

reason why George and Leigh would have any interest in receiving further product samples from

Excell if they were selling all of their assets and winding up the business.

On balance, we do not think the evidence supports the conclusion that SCK was winding

up its business at the time of the 2004 Agreement.  Therefore, we find that the relevant

background information includes the fact that SCK continued doing business at that time.

Excell relies heavily on one additional piece of evidence.  On April 1, 2005, Leigh wrote

a letter to Nominet UK, a company apparently involved in the transfer of the domain name to

Excell.  (Pl.'s Ex. 2 at 2.)  In that letter, he stated that "[w]e are in the process of selling the

intellectual property and other intangible assets held by [SCK], of which I am a director and

principle shareholder, to Excell Consumer Products Limited."  Cowley testifies that he received a

copy of this letter along with the signed copy of the 2004 Agreement that was enclosed in

Mumby's letter dated January 14, 2005.  (Cowley Aff. ¶ 52; Def.'s Ex. FFFF [W&W No. 2035];

Pl.'s Post-Trial Reply Br. at 4 n.13.)  According to Excell, this letter confirms SCK's intention to sell all of its intellectual property.  (Pl.'s Post-Trial Reply Br. at 5 ("A reasonable person, being delivered Ex. 2, at 1 and 2, together, would surely understand that the agreement included transferring 'the intellectual property and other intangible assets,' and thus the trademark and goodwill.")

We do not find, however, that Cowley's testimony on this point is credible.  He offers no reason to doubt the accuracy of the date on the letter, and fails to explain about how a letter dated April 1, 2005 could have been delivered to him the previous January.  Taking the letter at face value, it was a communication between Leigh and a third party three months after Excell and SCK executed the 2004 Agreement.  It could not, therefore, have been part of the background information available to the Excell and SCK at the time the contract was executed.  Moreover, this statement is not convincing evidence of SCK's intent at the time of the contract.  At that point, Leigh had moved to Thailand and transferred all of his shares in SCK to his father (contrary to his statement in the letter that he was a principal shareholder), and Warwick Adams had assumed management of the company.  (Leigh Blackbourn Aff. ¶ 9.)  It appears to have been Adams that negotiated the 2004 Agreement with Cowley.  (Cowley ¶¶ 44–49).  Under these circumstances, the way Leigh chose to characterize the 2004 Agreement to a third party, three months after the deal was concluded, has little bearing on our interpretation of the document.

In sum, we find that the relevant background information available to the Excell and SCK at the time of the 2004 Agreement includes the terms of their 2002 Licensing Agreement, which defined the extent of SCK's assets, and SCK's apparent intention to carry on with its business.

### iv.  The scope of the 2004 Agreement

Unfortunately, the relevant background in this case does not fully clarify the meaning of the document.  If we focus just on the assets identified in the agreement, we believe that a reasonable person with access to all of the relevant background information would interpret the document according to its natural, ordinary meaning: SCK sold Excell the rights to a domain name and two specified patent applications, and no more than that.  But that interpretation does not necessarily make the most sense in the context of the contract as a whole.

As we discussed above, a domain name does not ordinarily represent or embody other forms of intellectual property, such as trademarks or proprietary technical information.  SCK's total assets, as defined in the 2002 Licensing Agreement, included copyrights, manufacturing tooling, trademarks, patent rights, and technical information (defined as "all know-how, experience, drawings, designs specifications, diagrams, computer programs and other technical information relating to the Products. . .").  (Pl.'s Ex. 1, § 1.1.)  Nothing in the 2002 License, or in any other evidence on record here, suggests that SCK's domain name acquired special significance as the embodiment of all SCK's intellectual property.

Furthermore, the ordinary meaning of the 2004 Agreement is consistent with the evidence, discussed above, that SCK apparently planned to continue its business in some form at the time of the contract.  Under those circumstances, it makes sense for SCK retain ownership of the tooling, technical information, trademarks, and the rest of its intellectual property, other than the two patent applications and the domain name.

Nevertheless, reading the contract as a whole,  this interpretation leaves Excell and SCK in a very unclear business relationship.  For instance, Paragraph 1 of the agreement provides that

the sale of patent rights "replaces the license agreement dated 24 June 2002." It is undisputed that after the 2004 Agreement, Excell continued manufacturing and selling Smartcandle Products under the existing Smartcandle mark, through Structural and directly to retailers. If Excell only purchased patent applications and the domain name, but this purchase replaced the 2002 License in whole or in part, under what terms did SCK allow Excell to continue using its other intellectual property? Was it entitled to seek payment for that usage apart from the £ 85,000? The import of the non-compete agreement in Paragraph 3 is also obscure. There is no comparable provision in the 2002 License, so why would it be necessary now, if Excell remained in some sense SCK's licensee? A literal interpretation of the contract leaves these questions unresolved.

Excell's interpretation of the 2004 Agreement, despite its linguistic improbability, attempts to clear these questions up. If Excell purchased all of the intellectual property rights, then it would make sense to terminate the 2002 License Agreement. In that context, the non-compete clause also makes sense, because Excell would want to protect the intellectual property it just acquired. Thus, Excell argues that this is precisely the type of case where "the context and background [lead] to the conclusion 'that something has gone wrong with the language.'" *Chartbrook Ltd.*, 1 AC 1101 (quoting *I.C.S.*, 1 WLR 896). In other words, contract interpretation may depart from the ordinary meaning of the document's language, if the ordinary meaning leads to a result that the parties could not have intended. *Id.* Presumably, Excell and SCK would not have intended to draft their agreement in a way that left them with an incoherent business relationship.

We are therefore faced with a choice between an interpretation in which the words of the contract mean what they say, but lead to very confusing results, and an interpretation in which the meaning of the words defy linguistic sense, but reach a sensible business outcome. Under the circumstances of this case, and on the record before us, we believe the correct course is to adhere to the ordinary meaning of the words in the contract, despite the difficulties this interpretation presents. The reason is two-fold.

First, Excell's interpretation simply stretches the language of the contract too far. There has to be some connection between a contract's language and its meaning, to keep interpretation tethered to reality. Otherwise, we could substitute any given term with whatever meaning achieves our desired result anytime we decide that a contract does not make business sense. That is not purpose of contract interpretation. Under English law, "[t]he cardinal presumption is that the parties have intended what they have in fact said, so that their words must be construed as they stand." *Chitty on Contracts* ¶ 12-040 (27th ed. 1994). Here, we cannot imagine any possible context in which SCK's domain name was the equivalent of its total intellectual property, including technical knowledge, trademarks, and copyrights. Thus, we see no basis for concluding that when Excell and SCK bargained for the transfer of the domain name, and specified that particular asset in their written agreement, they intended that term to include the balance of SCK's intellectual property.

Second, there is no question that the literal meaning of this contract leads to a confusing result. But it is not an impossible result. A reasonable person possessing the relevant background knowledge could conclude that Excell and SCK simply negotiated an ill-conceived bargain, one that transferred certain specified assets without coherently defining the parties'

33

subsequent rights and obligations.  That conclusion is obviously not preferable to a reasonable interpretation that leads to a sound business outcome, but it is better than assigning a contract meaning to which the language is not susceptible.  We therefore conclude that Excell did not acquire the Smartcandle trademark in the 2004 Agreement.

> b.    *The assets that Excell acquired in 2004 did not allow it to use the trademark  in "real continuity with the past."*

Excell argues that even if it did not acquire all of SCK's intellectual property, it acquired rights in the trademark because it purchased sufficient assets to "go on in real continuity with the past."  (Pl.'s Proposed Conclusions of Law ¶¶ 5–9.)  The "real continuity with the past" test applies in the context of the "anti-assignment in gross" rule, which prohibits the assignment of a trademark without a company's related goodwill.  *See Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994).  In deciding whether to apply that rule, courts will look to see whether the assignee of a trademark acquired sufficient assets to use the trademark in "real continuity with the past"—in other words, whether the successor company has sufficient assets to maintain the quality of the goods in a manner that consumers have come to associate with the trademark.  *Id.* at 1350–51.

In cases like this one, where the purported assignee of the trademark purchases only part of a business's assets, it must show not only "real continuity with the past," but also that "the assignor divested himself of his trademark rights and business activity involving the mark." *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 392 (S.D.N.Y. 2011); *see also Greenlon, Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 895

(S.D. Ohio 1982).

In our discussion above, we observed that SCK remained in business until 2007 and held that it had not sold its trademark rights to Excell in the 2004 Agreement.  There is evidence, albeit slim, that SCK remained engaged in the business, because it requested product samples from Excell in January 2005.  Under these circumstances, Excell has failed to prove that SCK divested itself of trademark rights and business activities involving the mark.  Therefore, Excell may not use the "real continuity with the past" test to show that it acquired trademark rights.

2.    <strong>Subsequent agreements between Excell and SCK</strong>

Excell claims that the 2006 Agreement superseded the 2004 Agreement.  (Cowley Decl. ¶ 64; Pl.'s Ex. 14.)  For the reasons explained, we do not find that the document dated November 22, 2006 and entered into evidence as Plaintiff's Exhibit 14 is a genuine and accurate memorialization of the 2006 Agreement.  We further held that there is insufficient evidence in the record for us to determine the terms of whatever agreement Cowley and Leigh negotiated in 2006.  Therefore we do not find that Excell has met its burden of proving that SCK transferred its trademark rights to Excell at that time.

Finally, there is the 2010 Agreement.  (Pl.'s Ex. 19.)  According to this document, Leigh assigned "all commercial interests in the product known as 'SmartCandle'" for £ 20,000 "by the form of a document on the 30th November 2006[.]"  (*Id.*)  We observed above that we had questions about the validity of the document.  Beyond those concerns, however, the identities of the parties to the 2010 Agreement also present an obstacle to finding that SCK assigned its trademarks to Excell.

According to this document, Powerline, not Excell, acquired SCK's trademark rights from Leigh, acting as an individual.  (*Id.*)  Cowley testified that Powerline was acting on behalf of Excell.  (Cowley Aff. ¶ 74.)  But nothing on the face of the document supports this.  (Pl.'s Ex. 19.)  All we know about Powerline is that it is owned by Cowley and it "shares resources and contacts with Excell."  (Cowley Aff. ¶¶ 8, 10.)  That is insufficient to prove that Powerline stood in some sort of agency relationship with Excell.  *See* Restatement (Third) Of Agency § 7.03, comment d(3) (2006) ("Common ownership of multiple entities does not create relationships of agency among them.")  The evidence before us is insufficient to prove that assets acquired by Powerline automatically accrued to Excell.

With respect to Leigh, by his own admission, he transferred all of his shares in SCK to his father George in the fall of 2004.  (Leigh Blackbourn Aff. ¶ 9.)  This document describes him as acting as an individual in the November 2006 transaction, not on behalf of SCK.  (Pl.'s Ex. 19 (identifying "Party A" as "Leigh Blackbourne [*sic.*], an individual" and stating that "Party A agreed by the form of a document on the 30th November 2006, to assign all commercial interests in the product known as 'SmartCandle.'").)  It is not clear how Leigh, acting as an individual and divested of his stock in SCK, could have sold SCK's assets to anyone.

Finally, this document refers back to a document dated November 30, 2006 that is nowhere in evidence.  (*Id.*)  Cowley testifies that this was an error—he says that it actually refers to the document dated November 22, 2006 (Pl.'s Ex. 14), which we discussed above.  (Cowley Aff. ¶ 75.)  According to Leigh, it refers to a November 30th email confirming the oral settlement for £ 20,000.  (Leigh Blackbourn Aff. ¶ 21.)  Given our conclusion regarding the validity of the document dated November 22, 2006, we find Leigh's testimony on this point to be more

credible.  Because we have not seen the November 30, 2006 document, we draw no conclusions as to its contents.

In sum, we hold that Excell has failed to offer sufficient evidence to prove that it ever made a valid purchase of SCK's trademark rights.

### C.      SCK's abandonment of the trademark

Excell can still prove ownership through SCK's abandonment of the trademark.  "If a user of a mark discontinues use with the intent not to resume such use in the foreseeable future, then the mark may be deemed 'abandoned.'"  *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 317 (S.D.N.Y. 2012), as amended (Sept. 19, 2012) (citing 15 U.S.C. § 1127).  Nonuse of a mark "for 3 consecutive years shall be prima facie evidence of abandonment."  15 U.S.C. § 1127;  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).  Once abandoned, "a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace, in accordance with the basic rules of trademark priority."  *ITC Ltd.*, 482 F.3d at 147 (internal citations omitted); *Rockland Exposition*, 894 F. Supp. 2d at 317.

Here, SCK dissolved in 2007 (Leigh Blackbourn Aff. ¶ 21), and there is no evidence that it ever resumed operations.  Accordingly, SCK's nonuse of the mark for a period of more than three years indicates its lack of intent to resume use.  15 U.S.C. § 1127;  *ITC Ltd.*, 482 F.3d at 147.  Therefore, Excell's use of the mark from 2007 forward establishes its ownership of the trademark "in accordance with the rules of basic trademark priority."  *ITC Ltd.*, 482 F.3d at 147 (internal citations omitted); *Rockland Exposition*, 894 F. Supp. 2d at 317.  We turn now to Structural's claim that it has priority over Excell.

II.      **Structural's Claim of Trademark Ownership**

Throughout these proceedings, Structural has consistently maintained that its rights to the

U.S. trademarks have priority over Excell's, because: (1) it filed a valid application to register the

trademark in 2005, establishing presumptive ownership from that date forward; and (2) Excell

has no valid claim of ownership of the trademark prior to that date.  (Def.'s Proposed Findings of

Law ¶ 101; Trial Tr. vol. 1 at 14:14–18; Def.'s Post-Trial Br. 16–17.)

A trademark registration "is prima facie evidence of the mark's validity, and of the

registrant's ownership and exclusive right to use the mark in commerce in the United States."  15

U.S.C. § 1115(a); *Fusco Grp., Inc. v. Loss Consultants Int'l, Inc.*, 462 F. Supp. 2d 321, 327

(N.D.N.Y. 2006).  A party does not acquire ownership of a trademark through registration,

however.  *Fusco*, 462 F. Supp. 2d at 327; *Cartier, Inc. v. Three Sheaves Co., Inc.*, 465 F. Supp.

123, 127–28 (S.D.N.Y. 1979) ("The purpose of the registration scheme is not to create rights, but

to allocate the burden in the trial of an action for infringement.")  "Ownership of a trademark

stems from prior appropriation and use.  Where claimants dispute the right to use a particular

trademark, the general rule is that priority of appropriation and use determines which litigant will

prevail in its use."  *Fusco*, 462 F. Supp. 2d at 327 (internal quotations omitted).  According to

Structural, Excell cannot claim prior use, because Excell was still using the mark on SCK's

behalf as a licensee when Structural established its own use of the mark through the registration

applications.  (Def.'s Post-Trial Br. 16–17.)

That argument would perhaps be valid if Excell and Structural were separate and

independent companies.  But as Excell's distributor, it is not sufficient for Structural merely to

show that was using the mark at a time when Excell's rights were subordinate to SCK's.

38

Whether a distributor's use of a trademark establishes ownership depends on the nature of its relationship to the manufacturer.  *See McCarthy*, §§ 16.48–49, 29:8.

A distributor does not acquire ownership of a trademark if it merely "moves the goods in trade."  *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 111 (E.D.N.Y. 2012) (citing *Trademark Manual of Examining Procedure*, § 1201.06(a) (5th ed.2007)); *McCarthy* § 29:8 ("An exclusive U.S. distributor does not acquire ownership of a foreign manufacturers mark anymore than a wholesaler can acquire ownership of an American manufacturer's mark, merely through the sale and distribution of goods bearing the manufacturer's trademark.")  Under those circumstances, a distributor operates in the capacity of a licensee to the manufacturer.  *See McCarthy* § 16:48 (describing this type of distribution relationship as "either one of a non-trademark licensed buyer who resells branded merchandise or of a dealer licensed under the trademark to hold himself out as an authorized dealer").  On the other hand, when a distributor buys goods from a manufacturer and then applies its own mark, the distributor rather than the manufacturer owns the trademark.  *Id.*

This case falls somewhere in between those two paradigmatic situations.  *See, e.g.*, *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996) ("Unfortunately, not every distribution agreement fits clearly into one of these two categories.").  Excell had been selling Smartcandle Products in the U.S. as SCK's licensee through various distributors for approximately two years before it entered into an agreement with Structural.  Therefore, Structural was not simply contracting with a manufacturer for generic goods and applying its own mark.  On the other hand, as we explained in our findings of fact above, Structural took steps to build the brand in the U.S. beyond merely "moving the goods in trade."

To determine trademark ownership in these circumstances, "courts will look first to any agreement between the parties regarding trademark rights." *Haggar*, 906 F. Supp. 2d at 111; *Tecnimed SRL v. Kidz–Med, Inc.,* 763 F. Supp. 2d 395, 403 (S.D.N.Y.2011). "In the absence of an agreement between the parties, the manufacturer is presumed to own the trademark." *Haggar*, 906 F. Supp. 2d at 111; *Tecnimed*, 763 F. Supp. 2d at 403. But "an exclusive distributor may rebut this presumption by showing that it gave the goods 'the benefit of its reputation or of its name and business style.'" *Tecnimed*, 763 F. Supp. 2d at 403; *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001).

As we explained above, the parties never put their agreement into writing, despite repeated attempts by Structural. And while we stated above that we believed Vail's testimony that Cowley gave him permission to file a trademark application, oral permission to register a trademark is not sufficient to establish an agreement for the purposes of this analysis. Structural must show a "clear manifestation of intent" by Excell to transfer ownership of trademark rights. *Haggar*, 906 F. Supp. 2d at 111; *see also Software AG, Inc. v. Consist Software Solutions, Inc.*, No. 08 CV 389, 2008 WL 563449, at *17 (S.D.N.Y. Feb. 21, 2008). Courts considering this issue in this particular context, where a distributor registers a trademark that is later challenged by a foreign manufacturer, rely on the standard set forth in the Trademark Manual of Examining Procedure ("Trademark Manual"). *See Haggar*, 906 F. Supp. 2d at 111, 112 n.25; *Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc.*, 63 F. Supp. 2d 329, 335 (S.D.N.Y. 1999). The manual provides that a "United States importer or distribution agent for a foreign manufacturer" may only register the trademark in the United States if it shows (1) written consent; (2) a written agreement that the distributor owns the mark; (3) an assignment of the trademark "with the business and good will

40

appurtenant thereto." *Trademark Manual* § 1201.06(a).  There is no written agreement regarding trademark ownership or assignment of Excell's business in this case.

Therefore, in the absence of an agreement between the parties regarding ownership of the trademark, we apply the presumption that the manufacturer has superior rights to the trademark. *Haggar*, 906 F. Supp. 2d at 111; *Tecnimed* 763 F. Supp. 2d at 403.  Structural cannot rebut this presumption unless it is an exclusive distributor.  *See Tecnimed* 763 F. Supp. 2d at 403 ("An *exclusive* distributor may rebut this presumption . . .") (emphasis added); *McCarthy*, § 29:8 ("If there is more than one American distributor, no one of them is the 'exclusive' distributor and no one of them in the American 'owner' of the trademark.").  For the reasons explained above, we found that Structural did not prove at trial that it was an exclusive distributor.  Therefore, the presumption applies, and Excell owns the trademark.

The fact that Excell was using the mark as a licensee of SCK until early 2007 does not change our conclusion.  The presumption in favor of the manufacturer's ownership of the mark still applies.  Until 2007, Structural distributed goods bearing a mark ultimately belonging to SCK; thereafter it distributed goods bearing a mark belonging to Excell.  In neither case could it acquire ownership through its use of the trademark as a non-exclusive distributor.

This outcome is entirely consistent with the fundamental purpose of trademarks, to "signify that all goods bearing the trademark come from or are controlled by a single, albeit anonymous, source," and to "signify that all good bearing the trademark are of an equal level of quality."  *McCarthy* § 3.2.  Given our finding that Excell had the right under the Distribution Agreement to sell not only through Structural, but also directly to retailers independently of Structural, then it is Excell, not Structural, that is ultimately the single source of all Smartcandle

Products in the U.S.  Moreover, Structural did not have any means of controlling or maintaining the quality of the goods that Excell sold independently to other retailers.  Excell is the only company that could ensure an equal level of quality under these circumstances, because Excell is the source of all Smartcandle Products sold in the U.S..

Therefore, based on our conclusion that Excell owns the disputed trademarks, we hold Structural liable for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and dismiss its counterclaims with prejudice.  Based on our finding, explained above, that Structural acted in good faith without any intent to deceive or cause confusion, we hold that Plaintiff failed to prove its claims for "willful unfair competition" under the Lanham Act (Count II), unfair competition under New York law (Count IV), and false or fraudulent registration under 15 U.S.C. § 1120 (Count V).[8]  We dismiss those claims with prejudice.  Excell further failed to show "a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution," *L'Oreal USA*, 2013 WL 4400532, at *22, as required to succeed on a claim under N.Y. Gen. Bus. Law § 349 (Count III).  We therefore dismiss that claim with prejudice.

_____

[8] Following our conclusion that Excell owned the trademark, it is unnecessary to address Excell's claims that Structural fraudulently registered the trademarks.  For the sake of completeness, however, we note here that Excell failed to prove fraud.  A party "seeking cancellation of a trademark based upon fraud in the application bears a heavy burden."  *Quality Serv. Grp. v. LJMJR Corp.*, 831 F. Supp. 2d 705, 710 (S.D.N.Y. 2011).  "In establishing fraud, the party must identify a deliberate attempt by the registrant to mislead the PTO.  Merely making a false statement is not sufficient to cancel a mark."  *Id.* (internal citations and quotations omitted).  Because we found that Structural operated in the good faith belief that they had the right to register the trademark, we conclude that they did not deliberately attempt to mislead the PTO.

**RELIEF**

Excell seeks (1) a permanent injunction enjoining Structural from using "the trademark and trade name SMART CANDLE and the domain name SMARTCANDLE.COM," as well as trademarks that are "confusingly similar" or "likely to cause confusion . . . as to the origin of Plaintiff's products or their connectedness to Defendants;" (2) "a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the Injunction" within 30 days after entry of judgment; (3) "all damages suffered by Plaintiff resulting from the acts alleged therein" pursuant to 15 U.S.C. § 1117; (4) an accounting of all profits that Structural derived from its unauthorized use of Excell's trademark; (5) an order that Structural "deliver up for destruction all containers, labels, signs, prints, packages, wrappers, receptacles, advertising, promotional material or the like in possession, custody or under the control of either or both of the Defendants bearing a trademark found to infringe Plaintiff's trademark rights, as well as all plates, matrices, and other means of making the same," pursuant to 15 U.S.C. § 1118; (6) a declaration that "this is an exceptional case," awarding Excell "its full costs and reasonable attorney fees" pursuant to 15 U.S.C. § 1117; (7) the cancellation of Structural's Smartcandle trademark registrations."  (Amend. Compl. at 17–18.)

The scope of the relief we grant in this case is largely determined by our assessment, explained in detail in our findings of fact, that Structural operated under the good faith belief that it was the owner of the trademark, with no deliberate intent to deceive or cause confusion. Structural's failure to prove at trial that it was Excell's exclusive distributor precludes us from finding that it owns the trademark.  But given the circumstances described above, the balance of the equities in this case favors very limited relief for Excell.

43

A.      **Injunctive Relief**

"Courts have the authority to grant injunctive relief under the Lanham Act 'according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation' under Section 43(a) of the Lanham Act." *Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F. Supp. 2d 669, 675 (S.D.N.Y. 2009) (quoting 15 U.S.C. § 1116(a)). "A plaintiff may obtain a permanent injunction if it shows (1) actual success on the merits and (2) irreparable harm." *Id.*; *see also Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC.,* 553 F. Supp. 2d 201, 205 (E.D.N.Y. 2008); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003). "[P]roof of a likelihood of confusion establishes . . . irreparable harm." *Brennan's Inc. v. Brennan's Rest.,* 360 F.3d 125, 129 (2d Cir. 2004); *Philip Morris,* 592 F. Supp. 2d at 675. Excell has succeeded in proving its ownership of the trademark, and as we discussed above, the parties did not dispute likelihood of confusion. Therefore, it is entitled to a permanent injunction.

"It is axiomatic that the contours of an injunction are shaped by the sound discretion of the trial judge[.]" *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1542 (2d Cir. 1992); *see also Forschner Grp., Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) ("A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct."). "[T]he essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation, and to mould each decree to the necessities of the particular case." *Forschner*, 124 F.3d at 406.

44

We permanently enjoin Structural from using the name Smartcandle, or any name confusingly similar, in any manner that identifies its company or its products, including its domain name, logos, packaging, and marketing materials.  Structural is further enjoined from using any other logo confusingly similar to the Speech Bubble or Flame logos.

We enter this injunction, however, with the provision that Structural may have a reasonable grace period to be negotiated by the parties sufficient to fulfill any outstanding orders it has for Smartcandle Products, and sell off any other Smartcandle Products it has in its possession as of the entry of this judgement, and retain the profits on those sales.  District courts in the Second Circuit have held that when a defendant acts in good faith, "it may be appropriate to provide for a grace period rather than an immediately effective injunction."  *E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F. Supp. 502, 528 (E.D.N.Y. 1975) ("It is clear that in framing a decree which will protect plaintiff's mark, the court should be careful to minimize the injury to defendants to the extent practicable, where, as here, there is no evidence of bad faith."); *Carling Brewing Co. v. L. Fatato, Inc.*, 305 F. Supp. 1070 (E.D.N.Y. 1969) (entering an injunction that incorporated a grace period).

The Second Circuit upheld an injunction with a similar grace period in *George Basch*. 968 F.2d at 1542.  In that case, the court observed that the plaintiff had not moved for a preliminary injunction.  *Id.*  According to the court, "[s]ince [the plaintiff] itself apparently concluded that the economic harm it was suffering, if any, did not warrant a remedy at the outset of this action, we cannot say that the district court abused its discretion in allowing Blue Coral to sell off its remaining [infringing products] and retain the profits."  *Id.*  Similarly here, Structural acted in good faith, and Excell failed to move for a preliminary injunction at the outset of the

litigation.  Accordingly, we hold that a grace period is appropriate.

We deny Excell's request for the destruction of various materials bearing the Smartcandle mark, as inconsistent with the grace period we have awarded Structural.  We also deny its request for a report describing Structural's compliance with the injunction.  We have no reason to believe that Structural will fail to comply with our order.  Therefore, we find a written report excessive and unnecessary.

### B.      Monetary Relief

Excell is not entitled to any monetary relief in this case, either in the form of damages or an accounting of profits.  "Under the Lanham Act when trademark infringement is established the plaintiff is entitled to injunctive relief and 'subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) costs of the action.'" *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 706 (2d Cir. 1970) (quoting 15 U.S.C. §§ 1116–17).  "This does not mean that a successful plaintiff is entitled in all cases to a monetary award in addition to injunctive relief.  The award for damages is subject to the principles of equity.  Relief is properly denied where an injunction will satisfy the equities of the case and where there has been no showing of fraud or palming off."  *Id.*  (internal quotations omitted).

In *George Basch*, the Second Circuit engaged in a very thorough discussion of the basis for an accounting under the Lanham Act.  968 F.2d at 1537–40.  It concluded that "a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting."  *Id.* at 1540.  With respect to an award for damages, "it is well settled that in order for a Lanham Act plaintiff to receive an award of *damages* the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the

defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *Id.* at 1537 (emphasis in original) (internal quotes and citations omitted); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 493 (2d Cir. 1998). The Second Circuit has further held that "a plaintiff is not entitled to a monetary award when the defendant apparently acted in a good faith belief in his right to use the mark." *Carl Zeiss*, 433 F.2d at 707.

For the reasons discussed above, we find that Structural acted in good faith and did not engage in willful deception. Furthermore, Excell presented no evidence of actual consumer confusion. *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 576 n.6 (2d Cir. 1993) (". . .in this circuit proof of real and precise actual consumer confusion is required to recover damages.") (citing *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2d Cir. 1991)). Therefore, Excell is not entitled to an accounting of profits or an award for damages.

Finally, Excell is not entitled to attorney's fees. The Lanham Act provides that"[t]he court in exceptional cases may award reasonable attorney[s'] fees to the prevailing party." 15 U.S.C. § 1117(a). "To be entitled to attorneys' fees, the party must be the 'prevailing party' and, further, the case must be 'exceptional,' or, in other words, involve fraud, bad faith, or willful infringement." *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 304 (S.D.N.Y. 2012) (citing *Patsy's Brand Inc. v. I.O.B. Realty Inc.* (*"Patsy's Brand III"* ), 317 F.3d 209, 221 (2d Cir.2003)). As we have explained, this case does not involve fraud, bad faith, or willful infringement. Therefore, we do not award fees to Excell.

### C.     Cancellation of trademark registrations

In cases involving the status of a register trademark, a district court has the power to

cancel the registration.  *McCarthy* § 30:109 (citing *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir. 1962); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)).  In fact, "in cases not involving jury trials, district courts have been reversed for refusing to order the cancellation of registrations for claimed marks found to be incapable of serving as valid marks."  *Gracie v. Gracie*, 217 F.3d 1060, 1065 (9th Cir. 2000) (citing *Bascom Launder Corp. v. Telecoin Corp.,* 204 F.2d 331, 335–36 (2d Cir. 1953)).  We have determined that Excell is the owner of the trademarks registered under Structural's name.  We therefore order the cancellation of those registrations.

### CONCLUSION

We enter judgement consistent with the terms of this opinion.  It is so ordered.


_____
Marvin E. Aspen
United States District Judge


Dated:        New York, New York
              September 10, 2013

48