UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
EXCELL CONSUMER PRODUCTS LTD.,

        **Plaintiff,**

      - against -

                                **11 C 7220 (MEA)**
                                <u>**MEMORANDUM OPINION AND**</u>
                                <u>**ORDER**</u>

SMART CANDLE LLC, and
STRUCTURAL INTEGRITY PROPERTY
SERVICES, LLC,

        **Defendants.**
------------------------------------------------------------

**MARVIN E. ASPEN**, United States District Judge:

      Following a bench trial in April 2013, we entered judgment in favor of Plaintiff Excell Consumer Products Limited ("Excell") on September 17, 2013.  In our memorandum opinion and order, dated September 10, 2013 ("Opinion"), we discussed in great detail the business relationship between Excell and its former distributor, Defendants Smart Candle, LLC and Structural Integrity Property Services, LLC (collectively, "Structural").[1]  (Dkt. No. 51 (Op.).)  We ultimately concluded that Excell, and not Structural, owned the disputed "Smartcandle" trademarks and related designs and logos associated with a brand of battery-operated electronic candles.  As a result, we held Structural liable for unfair competition under the Lanham Act, cancelled Structural's trademark registrations, dismissed its counterclaims, and entered an injunction with a grace period.[2]  (Op. at 42–48.)

---

[1] As in our Opinion, we refer to the two Defendants collectively as "Structural."

[2] We further held that Structural operated under the good faith belief that it was the owner of the trademark, with no intent to deceive or cause confusion.  (Op. at 17–20.)  In light of that good faith, we dismissed Excell's claims for willful unfair competition and false or fraudulent registration.  (*Id.* at 42.)  We also denied Excell's requests for monetary damages, an accounting,

We assume familiarity with the pretrial, trial, and posttrial record in this case and will not recount the lengthy history or factual background, except when necessary to our analysis below. By way of overview, and as detailed in the Opinion, we found that Excell and Structural entered into an oral distribution agreement in October 2004, but that the agreement did not establish Structural as Excell's *exclusive* distributor in the United States.  (Op. at 9–17.)  We held that Excell acquired ownership of the trademark after the trademark's original owner and Excell's licensor, Smartcandles.co.uk Limited ("SCK"), abandoned its rights in July 2007.  (*Id.* at 37–38.) Given the relationship between Excell and Structural and the absence of a written distribution agreement, we applied the legal presumption that Excell, as the foreign manufacturer of Smartcandle products, had a superior claim to the trademark over Structural, as a non-exclusive distributor.  (*Id.* at 41.)

Structural challenges our conclusions, and the application of that presumption, in its pending Motion for Amended or Additional Findings, and to Alter or Amend the Judgment, filed under seal on October 4, 2013.

## STANDARD OF REVIEW

Under Rule 59(e), we may alter or amend a judgment if the moving party demonstrates that we "overlooked controlling decisions or material facts that were before [us] on the original motion" that might have materially influenced the outcome.  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 605 (S.D.N.Y. 2012); *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012); *Arthur Glick Truck Sales, Inc. v. Stuphen East Corp.*, 11 C 2824, 2013 WL 4028184, at *2 (S.D.N.Y. Aug. 8, 2013); *Lent v. Fashion Mall Partners, L.P.*, 243 F.R.D. 97, 98

and an attorney's fees award.  (*Id.* at 46–47.)

(S.D.N.Y. 2007); *see* Fed. R. Civ. P. 59(e); Fed. R. Civ. P. 52(b) (allowing the court to "amend

its findings—or make additional findings" and to "amend the judgment accordingly").  Thus, for

example, we may grant reconsideration if presented with "an intervening change in controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice."  *Sikhs for Justice*, 893 F. Supp. 2d at 605 (internal quotation omitted); *Arnold v.

Geary*, 09 C 7299, 2013 WL 5951489, at *2 (S.D.N.Y. Nov. 7, 2013); *Arthur Glick Truck Sales,

Inc.*, 2013 WL 4028184, at *2.  The Second Circuit has instructed that "Rule 59 is not a vehicle

for relitigating old issues, presenting the case under new theories, securing a rehearing on the

merits, or otherwise taking a second bite at the apple."  *Analytical Surveys, Inc.*, 684 F.3d at 52

(internal quotation omitted); *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995);

*Sikhs for Justice*, 893 F. Supp. 2d at 605–06.

"Reconsideration is an extraordinary remedy to be employed sparingly in the interests of

finality and conservation of scarce judicial resources."  *Sikhs for Justice*, 893 F. Supp. 2d at 605

(internal quotation omitted); *Arnold*, 2013 WL 5951489, at *2; *Arthur Glick Truck Sales, Inc.*,

2013 WL 4028184, at *2.  Accordingly, the standard on such a motion is strict.  *Shrader*, 70 F.3d

at 257; *Analytical Surveys, Inc.*, 684 F.3d at 52 (adding that denials of such motions "are

reviewed only for abuse of discretion"); *see Sikhs for Justice*, 893 F. Supp. 2d at 605.

## ANALYSIS

As set forth in the Opinion, our judgment in favor of Excell rests largely on two

determinations: (1) Structural was Excell's non-exclusive distributor; and (2) Excell was entitled

to the presumption that a foreign manufacturer owns a trademark vis-à-vis a non-exclusive

distributor.  (Op. at 17, 37–42.)  In its reconsideration motion, Structural takes issue with these

two conclusions and related issues, which we assess below.

**A.      Distribution Relationship between Excell and Structural**

We first consider Structural's argument that "no legally cognizable distribution

agreement" existed between Structural and Excell.  (Mem. at 11.)  In its reconsideration motion,

Structural identifies several misrepresentations of fact made by Excell's founder, Tim Cowley,

during the parties' negotiations in 2004.  (Mem. at 11; Reply at 3–6.)  Specifically, Cowley

represented to Structural's founders (Shane Vail and Joshua Kutzler) that Excell had the

authority to let Structural use the Smartcandle marks and name, when Excell was simply a

licensee of SCK and had no right to do so.  (Mem. at 11.)  Indeed, the parties do not dispute that

Structural had no knowledge of SCK until 2009.  (*See id.*; Resp. at 11.)  Structural further argues

that Cowley misrepresented Excell's ownership of a manufacturing facility and development of a

worldwide distribution network.  (Reply at 5–6.)  Structural contends that we overlooked the law

governing contract formation when we concluded, despite Cowley's misrepresentations, that the

parties entered into an oral distribution agreement in 2004.  (Reply at 3–5 (stating that Structural

could not have assented to enter into a contract under the circumstances).)  Structural asserts that,

to the contrary, the parties are separate and independent companies.  (Mem. at 11–14 (arguing

that Excell did not control either Structural's use of the mark or the quality of Smartcandle

goods, as necessary for the companies to be considered "related" under the Lanham Act).)

There are two fundamental problems with Structural's argument.  First, Structural did not

previously raise any contract formation argument, and it cannot use Rule 59 to do so now.

*Analytical Surveys, Inc.*, 684 F.3d at 52; *Shrader*, 70 F.3d at 257; *Sikhs for Justice*, 893

F. Supp. 2d at 605–06.  Structural claims that this contract formation theory is "consistent with

[its] argument at trial that [Excell] misrepresented its ability to create a distribution agreement."

(Mem. at 11 n.2 (citing Defs.' Post-Trial Br. at 10–17).)  At trial, and in its posttrial brief,

Structural asserted ownership of the Smartcandle marks due to its registration thereof with the

Patent Office.  (Defs.' Post-Trial Br. at 1.)  Structural further argued that Cowley's

misrepresentations led Structural to believe that it was the exclusive Smartcandle distributor in

the United States.  (*Id*. at 10–17; *see also* Defs.' Proposed Findings of Fact ¶¶ 154–71.)  Based

on those misrepresentations, Structural opposed Excell's request for cancellation of the

trademarks because it did not make false statements or engage in fraud when it filed the disputed

registrations.

    In short, Structural used Cowley's misrepresentations as evidence that Structural did not

intend to deceive the Patent Office because it honestly held a good faith belief that it could claim

ownership of the marks.  (Defs.' Post-Trial Br. at 8–15.)  Structural did not use Cowley's

misrepresentations as evidence that a contract never existed, or could not have existed, between it

and Excell.  Although the contract formation argument is "consistent with" the good faith

defense Structural raised earlier, it is nonetheless an entirely new legal theory presented for the

first time after judgment.  We cannot have overlooked or misapplied the law of contract

formation when Structural failed to disavow the contract in the first instance.

    This holding highlights the second problem with Structural's current theory.  Structural's

present argument, including both the contract formation and independence components,

completely contradicts its prior theory.  Structural consistently asserted—before, at, and after

trial—that the parties entered into an exclusive oral distribution agreement.  Before trial, for

example, Structural proposed the following finding of fact:

> The October 1, 2004 meeting resulted in an oral agreement between Plaintiff and [Structural] that [Structural] would implement its business plan in the U.S. and would thereafter be the exclusive distributor of the SMART CANDLE battery-operated candles in the U.S.

(Defs.' Proposed Findings of Fact ¶ 30.)  In his opening argument, Structural's counsel stated that "[his] clients were the exclusive distributors of the exclusive right to market the products in the United States."  (4/16/13 Trial Tr., Gleekal Opening at 11; *id.* at 13–14; *see also* 4/17/13 Trial Tr., Gleekal Closing at 189–91.)  During trial, Kutzler testified that the parties reached a verbal agreement on October 1, 2004 for Structural to become Excell's exclusive distributor. (4/16/13 Trial Tr., Kutzler Cross at 129; *see also id.* at 130–31.)  Structural then reiterated this position in its posttrial brief.  (Defs.' Post-Trial Br. at 14 (again stating that the parties' 2004 "meeting resulted in an oral agreement whereby [Structural] would implement its business plan" and become the exclusive distributor).)

In light of Structural's repeated assertions that it was Excell's exclusive distributor in the United States, we considered the nature of the parties' relationship in depth in the Opinion.  (Op. at 9–17.)  Based on testimony from Cowley and Kutzler, we concluded that the parties reached an oral distribution agreement in their October 2004 meeting, as Structural claimed.  (*Id.* at 10.) Having reviewed all of the evidence and arguments presented by the parties, we further held that Structural had not proven by a preponderance of the evidence that the parties agreed to an *exclusive* distributorship.  (*Id.* at 17.)  Though displeased with that conclusion, Structural cannot raise a new argument in its Rule 59 motion, let alone an argument that is wholly incompatible with its prior theories.  Structural is bound by the arguments and testimony presented at trial, which we comprehensively evaluated, and we reject its efforts to recast the nature of its

relationship with Excell.

**B.     Excell's Status as Manufacturer or Supplier of Smartcandle Products**

As part of its attack on the presumption that favored Excell, Structural also asserts that

the record evidence does not support our conclusion that Excell was a manufacturer, or even a

supplier, of Smartcandle products.  (Mem. at 9–10; Reply at 6–8.)  According to Structural, the

evidence requires the opposite result, as it shows that Excell did not physically make

Smartcandle products, own a manufacturing facility, provide packaging for the candles, ship

orders from the factory in China, or receive payment directly to cover the costs of products

ordered by Structural.  (Mem. at 9–10; Reply at 6–7.)

For its part, Excell admitted that it does not own the factory where the candles are

manufactured.  (*See, e.g.*, 4/16/13 Trial Tr., Cowley Cross at 37–39, 42.)  In his testimony,

Cowley acknowledged that he does not monitor production of the candles on a day-to-day basis

at the factory in China.  (*Id.* at 43.)  Cowley testified, however, that he controlled the

manufacturing of the goods because he "signed off the product that was being manufactured."

(*Id.* at 43; *see, e.g.*, *id.* at 22–25, 49–50 (explaining how Excell altered the tooling used in the

manufacturing process in 2005, thereby changing the design).)  In its response, Excell argues that

it is immaterial whether it is technically a manufacturer, because it retained control over the

quality of the goods produced.  (Resp. at 13–17.)  With the parties' positions in mind, we turn to

Structural's contentions.

**1.     The Extent of Excell's Quality Control**

The parties vigorously dispute whether Excell exercised sufficient quality control over

production of the candles—both generally and with respect to specific incidents and customer

complaints—such that Excell controlled Structural as a related entity.[3] (Mem. at 12–14; Reply at 8–13; *see* Resp. at 15–18.) Structural relatedly argues that we erroneously concluded that Excell was a manufacturer in the Opinion because we found that it exercised quality control, rather than Structural. (Mem. at 5.)

In light of the full record before us, we cannot agree with Structural that we committed clear error in finding that Excell was the source of Smartcandle goods. (*See* Op. at 41–42 (holding that Excell was the only entity in this scenario that could ensure the quality of the goods).) In his written trial testimony, Cowley stated that he communicated regularly (if not daily) with staff at the factory in China about Smartcandle products and visited the factory on a number of occasions, once with Structural's Vail. (Cowley 2/26/13 Decl. ¶ 109.) Cowley also described the steps that Excell takes to ensure the quality of the candles produced, in addition to the efforts undertaken by distributors and the manufacturing facility. (*Id.* ¶¶ 100–11.) Cowley stated, for example, that he conducts "use and abuse" testing of factory samples and does not approve the product until he is satisfied. (*Id.* ¶ 104; *see also id.* ¶ 106 (describing the "use and abuse" procedure).) He reported that he forwards samples to distributors, as well as independent laboratories, for their testing and feedback. (*Id.* ¶ 106.) Although, in its reply brief in support of this motion, Structural raises an argument that Cowley's declaration lacks the detail needed to establish actual quality control, Structural does not dispute the veracity of his testimony. (*See* Reply at 10–11.)

---

[3] In light of our prior holding, affirmed here, that Structural was Excell's distributor, we need not address whether the parties are otherwise related.

Instead, Structural insists that Excell abdicated quality control responsibilities.  (Mem. at

12–14.)  In support of this claim, Structural points out that it maintained a log of defective

merchandise returned by customers, which it "tested and confirmed to not be working up to the

expected quality."  (*Id.* at 12 (citing Pl.'s Ex. 187 at 9 (3/19/10 Kutzler email to Faith Global and

Cowley forwarding damages listing)); Reply at 12.)  The log identifies defective inventory and

the value thereof.  (Pl.'s Ex. 187 at 9.)  According to the email, Structural submitted the log to

request credits for the defective merchandise.  (Pl.'s Ex. 187 at 9.)  Although this single piece of

evidence indicates that Structural tracked and tested returned merchandise before requesting

credit, it does not support Structural's broad claim that Excell relied heavily on Structural or its

damages log for quality control functions, particularly proactive quality control functions.  The

weight of the record evidence does not support Structural's position.

We are similarly not persuaded by Structural's argument that Excell's partial delegation

of quality control functions to third parties, including the physical manufacturer of the goods

(Faith Global or Keiyo), undermines its position.  As a legal and practical matter, "[t]here seems

to be no reason why the licensor should not be permitted to appoint a third party agent to carry

out the actual inspection and evaluation of the licensee's goods . . . and to measure them against

the standards created or adopted by the licensor."  *See* 3 *McCarthy on Trademarks and Unfair*

*Competition* § 18:60 (4th ed.).  The facts in this case demonstrate affirmative conduct on Excell's

part to control quality, as summarized above.  As a result, the evidence does not support a

conclusion that Excell failed to exercise effective control because it relied on Faith Global and

distributors to assist with quality control functions in coordination with its own efforts.  *Id.*

We also have not interpreted the record to support Structural's claim that Excell did not

exert control over the quality of Smartcandle goods with respect to occasional production issues. (Mem. at 12–14; Reply at 11–13.)  Structural does not argue that pervasive problems with the quality of the goods required Excell to increase its efforts.  (*See, e.g.*, Op. at 23 (explaining that SCK did not need to take greater measures of control, in part due to lack of problems with the goods produced during the term of Excell's license agreement); Pl.'s Ex. 187 at 10 (10/27/09 Vail email to Faith Global and Cowley, commenting that—other than the discoloration issue the parties had been handling—the remaining defectives were insignificant for such products).)  The parties have not argued the point, but the two apparently isolated incidents described by Structural would not seem so serious as to trigger an obligation for Excell to exercise more stringent control to maintain its rights.  Additionally, Structural's suggestion that Excell played no meaningful role in investigating or resolving production problems is not borne out by the evidence.  (Pl.'s Ex. 171 (9/2007 email correspondence between Cowley and Faith Global concerning product testing following a fire allegedly caused by a Smartcandle product); Pl.'s Ex. 187 at 7 (6/20/08 Cowley email to Vail informing Structural of a potential problem with discolored wax and indicating that Cowley would undertake "a full QC check on the stock, and let you and the factory know our findings"); Pl.'s Ex. 187 at 1 (9/27/08 10:12 Cowley email to Vail reporting on the "100% QA [performed] on the shipment we received" with the results and resolution of the discoloration problem, and stating that Excell was continuing to monitor samples); *see, e.g.*, Pl.'s Ex. 187 at 1 (9/27/08 16:43 Cowley email to Vail (explaining that Excell will be checking the latest delivery as well from the new production, with the hope that the problem is solved).)  For these reasons, we did not err in treating Excell as the manufacturer of Smartcandle goods.

### 2.      Ownership of the Manufacturing Facility

In addition to arguing that Excell shirked quality control, Structural contends that Excell

cannot be a "manufacturer"—and thus is not entitled to the presumption in favor of a

manufacturer—because it did not own the factory in China where the candles were physically

produced.  (Mem. at 9–10; Reply at 6–7.)  Neither party has presented any useful authority on the

question of whether an entity must own, or perhaps regularly manage, the production facility to

be treated as a manufacturer or supplier for purposes of the presumption.  In the absence of any

authority to the contrary, we need not alter our prior holding on this basis.  (*See* Op. at 41–42

(applying the presumption because Excell was the source of goods).)  As a practical matter, an

entity does not need to physically assemble the goods to be considered a manufacturer for this

purpose, so long as that entity remains responsible for the quality of the goods produced.[4]

This conclusion both reflects the reality of parties' relationship and serves the underlying

purposes of trademark law, as discussed in the Opinion.  (Op. at 41–42.)  Structural is not

suggesting that the owners or operators of the factory are entitled to a presumption of ownership

in the marks.  And Structural's characterization of Excell as a simple intermediary is inaccurate.

(Reply at 7 (stating that Excell's "role was merely to refer sales").)  Trademark law seeks to

ensure that all goods bearing a mark come from a single source that ensures the expected level of

quality.  *McCarthy* § 3.2.  On the record before us, we previously concluded that Excell is that

source for Smartcandle products.  (Op. at 39–42.)  We thus did not commit clear error in holding

---

[4] This reasoning is also consistent with our holding above that Excell could delegate quality control functions without undermining its position.  *See McCarthy* § 18:60.  If Excell could reasonably delegate quality control duties, it follows that Excell could also reasonably delegate factory production of the candles.

that Excell is entitled to the presumption under these unique facts.

**CONCLUSION**

We acknowledge again that the facts of this case are convoluted and, overall, present a scenario that does not fit neatly into the usual trademark paradigms.  (Op. at 9, 39.)  Although we supplement our Opinion with the reasoning herein, our conclusion remains the same:  Excell has superior rights to the disputed trademarks over Structural.  Structural has not met the strict standards of Rule 59 to justify reconsideration of the Opinion.  Structural's motion is therefore denied.[5]  It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Dated:        Chicago, Illinois
              May 5, 2014

---

[5] We need not address Structural's remaining arguments, which are moot, rehash its earlier positions, or attempt to articulate new theories.  For the sake of clarity, we add that Structural's reliance on the consumer expectations factors is misplaced. (Mem. at 18–21.)  As stated in the Opinion, Structural cannot rebut the presumption in favor of Excell as a manufacturer because Structural is not Excell's *exclusive* distributor. (Op. at 41.)  *See also Tecnimed SRL v. Kidz–Med, Inc.,* 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001).